THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. MAURICE E. CONNOLLY and FREDERICK SEELY, Appellants.

(Argued March 31, 1930; decided May 6, 1930.)

*Max D. Steuer* and *Ben Herzberg* for Maurice E. Connolly, appellant. Error was committed in admitting against Connolly evidence of Moore's cash deposits. (*United States* v. *Kissel,* 218 U. S. 601; *Cuyler* v. *McCartney,* 40 N. Y. 221; *Rutherford* v. *Schattman,* 119 N. Y. 604; *Flynn* v. *Crimmins,* 17 N. Y. S. R. 987; Stephen's Digest of the Law of Evidence [2d ed.], art.

4, p. 15; *Danville Bank* v. *Waddell,* 31 Gratt. [Va.] 469;
*United States* v. *McKee,* 3 Dill. 546; *State* v. *Robinson,*
97 W. Va. 691; *People* v. *MacPhee,* 26 Cal. App. 218;
*People* v. *McQuade,* 110 N. Y. 284; *Garnsey* v. *Rhodes,*
138 N. Y. 461; *New York G. & I. Co.* v. *Gleason,* 78
N. Y. 503.) Error was committed in admitting evidence
of the defendant Connolly's cash payments. (*People* v.
*Gaffey,* 182 N. Y. 257; *Williams* v. *United States,* 168
U. S. 382; *People* v. *Bissert,* 71 App. Div. 118; *Heaton*
v. *United States,* 280 Fed. Rep. 697; *People* v. *Schooley,*
149 N. Y. 99.) The evidence of Moore's bank deposits
was inadmissible. (*People* v. *Sharp,* 107 N. Y. 427;
*People* v. *Stetz,* 206 App. Div. 223; *Williams* v. *United
States,* 168 U. S. 382; *People* v. *McQuade,* 110 N. Y. 284;
*Garnsey* v. *Rhodes,* 138 N. Y. 461; *New York G. & I.
Co.* v. *Gleason,* 78 N. Y. 503; *Samples* v. *People,* 121
Ill. 547; *State* v. *McGee,* 81 Iowa, 17; *Hughes* v. *State,*
19 Oh. Cir. Dec. 237; 77 Oh. St. 640.) The theory that
the evidence of Moore's bank deposits was admissible
as proof of Phillips' acts cannot be upheld. (*People* v.
*Bissert,* 71 App. Div. 118; 172 N. Y. 643; *Heaton* v.
*United States,* 280 Fed. Rep. 697.)

*John J. Curtin, Wesley S. Sawyer* and *Joseph R. Jack-
son* for Frederick Seely, appellant. The verdict of the
jury as to the guilt of the defendant Seely is without
evidence to support it. (*People* v. *Razezicz,* 206 N. Y.
249; *People* v. *Gluck,* 188 N. Y. 167; *Lamb* v. *Union R.
Co.,* 195 N. Y. 260; *People* v. *Kennedy,* 32 N. Y. 141;
*People* v. *Harris,* 136 N. Y. 423; *People* v. *Fitzgerald,*
156 N. Y. 253; *Manning* v. *John Hancock Mutual Life
Ins. Co.,* 100 U. S. 693; *U. S.* v. *Ross,* 92 U. S. 281;
*Lamb* v. *Union Ry. Co.,* 195 N. Y. 260; *O'Gara* v. *Eisen-
lohr,* 38 N. Y. 296; *Rupert* v. *Brooklyn H. R. R. Co.,*
154 N. Y. 90.) Reversible error was committed in admit-
ting as against the defendant Seely evidence of cash
deposits made by Moore. (*Cuyler* v. *McCarthy,* 40 N. Y.

221; *Williams* v. *U. S.*, 168 U. S. 382.) The admissions of evidence as to private real estate transactions carried on by defendant Connolly and his wife were substantial error. (*Williams* v. *United States*, 168 U. S. 396; *People* v. *Razezicz*, 206 N. Y. 249; *People* v. *Kennedy*, 32 N. Y. 146.)

*Hamilton Ward, Attorney-General* (*Emory R. Buckner, John M. Harlan* and *Herman T. Stichman* of counsel), for respondent. The evidence that Moore, consulting engineer, made deposits in his bank account, principally in cash, and largely in excess of his salary, was properly admitted. (*People* v. *Mather*, 4 Wend. 229; *Leverkuhn* v. *United States*, 297 Fed. Rep. 590; 266 U. S. 603; *Clune* v. *United States*, 159 U. S. 590; *Pierson* v. *People*, 79 N. Y. 424; *People* v. *Gaffey*, 182 N. Y. 257; *Commonwealth* v. *Mulrey*, 170 Mass. 103; *Commonwealth* v. *Coyne*, 228 Mass. 269; *Weisenbach* v. *State*, 138 Wis. 152; *People* v. *Miles*, 123 App. Div. 862; 192 N. Y. 541; *Reg.* v. *Parnell*, 14 Cox Cr. Cas. 508; *People* v. *Van Tassel*, 156 N. Y. 561; *People* v. *Dunbar Contracting Co.*, 165 App. Div. 59; 215 N. Y. 416.) It is not necessary that each conspirator should be familiar with the overt act of another providing the case when taken as a whole discloses a common purpose and design. (*People* v. *Miles*, 123 App. Div. 862; 192 N. Y. 541; *People* v. *Van Tassel*, 156 N. Y. 561; *People* v. *Micelli*, 156 App. Div. 756; 216 N. Y. 727; *People* v. *Peckens*, 153 N. Y. 576; *Kelley* v. *People*, 55 N. Y. 565; *Danzer* v. *Nathan*, 145 App. Div. 448.) The evidence of Connolly's cash transactions was properly admitted. Evidence that a defendant during or shortly after the time of the crime charged against him, was in possession of moneys in excess of his usual means or sources of income, frequently referred to as evidence of sudden enrichment, is admissible. (*Gordon* v. *People*, 33 N. Y. 501; *People* v. *Gaffey*, 182

N. Y. 257; *Commonwealth* v. *Coyne,* 228 Mass. 269;
*Commonwealth* v. *Mulrey,* 170 Mass. 103.) Evidence
tending to show consciousness of guilt is admissible as a
circumstance which the jury may take into consideration
with the other evidence in the case. (*Greenfield* v. *People,*
85 N. Y. 75; *People* v. *Place,* 157 N. Y. 584; *Lindsay*
v. *People,* 63 N. Y. 143; *People* v. *Schooley,* 149 N. Y.
99; *Stover* v. *People,* 56 N. Y. 315; *People* v. *Dyle,* 21
N. Y. 578; *People* v. *Johnson,* 140 N. Y. 350.)

HUBBS, J. The defendants, Connolly and Seely, have
been convicted of the crime of conspiracy, in violation
of subdivision 4 of section 580 of the Penal Law, which
makes it a misdemeanor for two or more persons to
conspire "to cheat and defraud another out of property,
by any means which are in themselves criminal, or which,
if executed, would amount to a cheat, or to obtain money
or any other property by false pretenses." At the time
of the alleged conspiracy, Connolly was Borough Presi-
dent of the borough of Queens, city of New York. Seely
was an assistant engineer of the borough of Queens.
Clifford B. Moore was a consulting engineer in the
engineering department of the borough and John M.
Phillips was a dealer in sewer pipe, engaged in selling
precast lock-joint sewer pipe. The People's case was
based upon the claim that the defendants, Connolly and
Seely, conspired with Moore, who was not indicted, and
Phillips, who was indicted but died before trial, to so
manipulate the advertisements for bids for contracts to
construct sewers that the bidders were compelled to use
the particular kind of pipe sold by Phillips, and that
thereby Phillips was enabled to charge exorbitant prices
for such pipe, and thus obtained a monopoly of the sale
of pipe to contractors in the borough of Queens, the
result being that the city let contracts for sewers at prices
far in excess of the fair and reasonable cost of the same.
It was charged that the defendant Seely so drafted

the specifications for sewers that bidders for contracts were practically compelled to use the special kind of pipe sold by Phillips, and that Moore furnished to Connolly written advices which, upon the face of the writings, justified Connolly in signing the contracts let at exorbitant prices. It was charged that as a result of such conspiracy, Phillips received over $3,000,000 for pipe in excess of an amount which would have been a fair and reasonable price for such pipe, and that the city paid to contractors for sewers that amount over which it would have been obliged to pay if it had not been for such conspiracy. It was also charged that in certain instances the lowest bidder for certain sewer contracts had put in a bid in opposition to the wishes of Phillips and with an intent not to use his pipe, and that in those instances, as a result of the conspiracy, the low bids were rejected by Connolly and thrown out. He, as Borough President, had authority to reject a bid and to readvertise for new bids. In all such instances where a low bid was rejected and the contract readvertised, one of Phillips' friendly contractors was the lowest bidder and received the contract.

In all cases where a new sewer was to be constructed, and before advertisements for bids for contracts to construct were published, the engineering department made a carefully prepared estimate of its fair cost. The contracts in question were let at a very much higher cost to the city than the engineers' estimates called for. In some instances contracts were let at twice the estimated cost. In certain cases the increased cost was measured approximately by the difference between the amount which the contractor was obliged to pay Phillips for the pipe used, and what would have been a fair price for it. In most cases the contractors were obliged to pay Phillips from five to ten times the fair value of the pipe used. As a result the city paid over $3,000,000 more for the construction of the sewers in question than it would

have paid if the contractors could have purchased the pipe at a fair price or if the specifications for pipe had been fairly drawn so that the contractors could have used different kinds of pipe.

In our opinion there can be no reasonable question that the evidence established a *prima facie* case of the existence of the conspiracy charged.

Upon this appeal, no question is raised by the defendant Connolly that the evidence did not establish a *prima facie* case of the existence of a conspiracy between Phillips and himself. The defendant Seely does urge that a *prima facie* case was not established against him.

No useful purpose would be accomplished by a detailed recital of the evidence which leads us to the almost irresistible conclusion that the guilt of both defendants was established beyond a reasonable doubt. The prevailing opinions delivered in the Appellate Division discuss the evidence in detail. With the conclusion reached in that court as to the facts we are in full accord.

It is urged that the admission of certain evidence over the objection and exception of the defendants constituted error which requires the reversal of the judgment. Connolly's bank account was received in evidence and testimony was also received tending to establish the fact that during the years 1925, 1926 and 1927 he was in possession of and used over $145,000 in currency in excess of the amount of his salary, and that none of that money passed through his bank accounts. It is argued that such evidence was erroneously received. In considering the question of the legality of the receipt of such evidence, it must be borne in mind that the defendant Connolly concedes that the People's evidence established a *prima facie* case of conspiracy between him and Phillips. The evidence tended to establish that during a period of less than three years he used in currency over $145,000 in purchasing real estate, making loans, buying mortgages and paying his architects' fees. Twenty-three trans-

actions were involved with fourteen different persons. The different transactions each involved the use of currency in amounts varying from $2,000 to $19,000. Real property mortgages were purchased for which he paid in currency $5,800, $6,500, $11,000 and $15,500 each, and he loaned in currency $15,000 on one occasion and $19,000 on another. Those unusual and extraordinary transactions took place during the periods when Phillips, his co-conspirator, was defrauding the city of vast sums of money, by reason of contracts executed by Connolly as Borough President, signed in some instances upon the written advice of Moore, his consulting engineer, and based upon specifications prepared by the defendant Seely in such a manner as to prevent fair, competitive bidding.

It is also contended that the evidence of Moore's bank account was improperly received. Moore was a consulting engineer. He was appointed as assistant engineer in 1904 at a salary of $1,650 per annum. He remained in the engineering department until after the time in question. His salary had been increased to $8,000 per annum and he had been promoted to the position of consulting engineer. He made written recommendations to Connolly, in regard to the acceptance or rejection of bids for sewer contracts, and the signing of such contracts. Contracts in question were signed by Connolly upon Moore's written recommendation, in cases where Phillips' interest was involved, which contracts enabled Phillips to extort large sums from the contractors, thereby increasing the cost of the sewers to the city. He recommended the signing of contracts, the bids for which he must have known were much higher than the engineers' estimates, and grossly excessive in amount. The bids in question ran from approximately fifty per cent to one hundred per cent higher than the engineers' estimates. He recommended the acceptance of bids put in by con-

tractors favored by Phillips in cases where the bidders had never had any experience in sewer construction work, did not have any equipment to do the work and had no financial responsibility. When such bidders received contracts, they promptly assigned them to parties recommended by Phillips, and received large sums for the assignments, and Phillips also received large sums for bringing about the assignments.

The witness Paulsen had received a contract, after agreeing with Phillips to use his pipe at an exorbitant price named by Phillips. Trouble arose about the payment for the pipe. Paulsen desired to bid on another contract but was notified by Phillips not to bid and informed that he could not get another contract. He disregarded Phillips' warning and put in a bid, figuring the pipe at a much lower figure than he had agreed to pay Phillips for pipe for his existing contract, hoping to be able to make the pipe himself. His bid was about $150,000 lower than the next lowest bid. Paulsen was notified to appear at the engineers' office. He went and had a talk with Moore and the Commissioner of Public Works in regard to the time when he could commence work on the first contract which had been awarded to him under an agreement to use Phillips' pipe. He testified that he told them that he would be ready to start work in July. That conversation was on May 27th. Moore wrote a letter to Connolly on June 22d, in which he referred to the conversation with Paulsen and wrote: " He stated * * * at that time that he would have all of the material on the job the following Tuesday and would start work in earnest inside of a week after that." In that letter he called attention to the fact that the second contract had not yet been let and suggested, in effect, that it should not be, because Paulsen had not shown good faith in commencing the other contract as he had promised to do. The jury might have found that the statement in the letter was

intentionally false and written to give Connolly an excuse for rejecting the bid. Two days later Connolly rejected the bid.

We deem it unnecessary to state further details of Moore's conduct in relation to the bids and contracts in question. We are satisfied that the evidence justified the trial court in reaching the conclusion that a *prima facie* case had been established, that Moore was a party to the conspiracy. He supplied the letters which furnished an excuse for Connolly to sign contracts on bids double the engineers' estimates, although he was a consulting engineer himself. He wrote letters suggesting the rejection of the lowest bids, in cases where it was for Phillips' interest to have the bids rejected. In at least one instance the jury might have found that the reason assigned for rejecting a bid was deliberately false. He apparently did everything a conspirator in his position would do to facilitate the conspiracy. Were the recommendations made by Moore honest? Were they made to furnish Connolly an excuse? Did he have a dishonest motive? Was he a co-conspirator with Phillips, Connolly and Seely? Under all the facts and circumstances in the case, those were questions of fact for the consideration of the jury.

In prosecutions for the crime of conspiracy the People's case must usually rest upon circumstantial evidence. Defendants, with the education, training and experience of the defendants in this case, do not conduct criminal conspiracies by making written records of their acts. Standing alone, the evidence of various transactions introduced by the People has little or no probative force. It is only when the evidence is viewed as a whole, in the light of all the surrounding circumstances, that it points irresistibly to the conclusion that the defendants were engaged in an unlawful scheme to defraud the city.

Moore had not been indicted and was not on trial. Nevertheless, the People were entitled to prove that he

was a member of the conspiracy and that his acts in writing Connolly, advising the signing of contracts and the rejection of bids, were in furtherance of the conspiracy. (*Clune* v. *United States*, 159 U. S. 590, 593.)

A *prima facie* case of conspiracy having been established, evidence of every act of the individual conspirators done in furtherance of the common purpose is admissible. (*People* v. *Davis*, 56 N. Y. 95; *People* v. *Cassidy*, 213 N. Y. 388.) The theory upon which such evidence is held to be admissible has been stated in various ways. The fact that it is admissible has not been questioned.

As a *prima facie* case was established that Phillips and Connolly were engaged in a conspiracy, it follows that evidence of the acts of each in furtherance of such conspiracy was properly received. While the conspiracy existed and Phillips and Connolly were actively engaged in it, and Phillips was receiving on the average over a million dollars a year unlawfully as a result of the conspiracy, Connolly possessed over $145,000 in currency which he used in the irregular and extraordinary manner described.

The receipt of the evidence of Connolly's financial transactions during the period was justified by elementary principles governing the admissibility of evidence under such circumstances. Phillips and Connolly were engaged in an unlawful scheme to create a fund by fraudulently inducing the city to let contracts at a dishonest and exorbitant price. The unlawful acquisition of money was the very purpose of the conspiracy. The fruits of the dishonesty were traced into the possession of Phillips, one of the co-conspirators. Connolly's unlawful acts helped create the fund. What was his motive? Why did he depart from the path of rectitude and become a party to such a corrupt scheme? The answer is found in the evidence of his possession of that large sum of money, which he tried to cover up so that his possession of it could not be traced through his bank

accounts. The evidence established his motive, evidence of which is always competent in a criminal case. (*Pierson v. People*, 79 N. Y. 424, 435.)

It also tended to establish that the co-conspirators were dividing the spoils. The evidence was admissible for the purpose of establishing that Connolly, during the commission of the conspiracy, was in possession of currency in excess of his usual income. His bank accounts disclosed that his salary was deposited and checked out in the usual way and that the $145,000 did not pass through such accounts.

It was not necessary to offer further preliminary proof of his financial means, and by evidence exclude the possibility that he came by the money honestly. (*Gordon v. People*, 33 N. Y. 501; *People v. Gaffey*, 182 N. Y. 257; *Commonwealth v. Mulrey*, 170 Mass. 103; *Commonwealth v. Coyne*, 228 Mass. 269; Wigmore on Evidence [2d ed.], vol. 1, § 154.)

Connolly testified in his own behalf but failed to offer any explanation of his possession of such a large amount of currency or of his unusual manner of handling it. That was a circumstance which the jury was entitled to consider in determining his guilt or innocence of the crime charged. He was not obliged to become a witness, but having done so, his conduct as a witness must be measured by the same standards as apply to the conduct of other witnesses. (*Stover v. People*, 56 N. Y. 315, 320; *People v. Dyle*, 21 N. Y. 578; *People v. Johnson*, 140 N. Y. 350.)

During the period when Phillips was fraudulently extracting over $3,000,000 from the contractors which ultimately was paid by the city, and Connolly was in possession of over $145,000 more than his salary, Moore deposited in a bank over $60,000 more than his salary, over $52,000 of which sum was deposited in cash. It is urged that evidence of Moore's bank account was improperly received. The same reasons that made evidence of Connolly's financial transactions competent,

made evidence of Moore's bank account competent. It was competent upon the question of motive and to show sudden enrichment. It, in connection with the other evidence in the case, explained his acts in furnishing Connolly with plausible written excuses for signing fraudulent contracts and for rejecting the low bids for other contracts. The jury in considering Moore's written recommendations to Connolly, was entitled to know Moore's relationship to the conspiracy, which had been established *prima facie* as existing between Phillips and Connolly. If the jury found from all the evidence in the case that Moore was implicated in the conspiracy, the evidence of his acts in furthering the conspiracy was competent. It was not necessary that there be direct evidence that Moore had become a co-conspirator before his acts in furtherance of the conspiracy could be proved. It was sufficient to establish that fact *prima facie* by circumstantial evidence, and we are satisfied that it was established.

It was not necessary to prove a conspiracy before evidence of specific acts of the alleged conspirators could be received. The conspiracy itself could be established by evidence of particular acts, which, taken together, furnished a basis for a finding that a conspiracy existed. (*People* v. *Miles*, 123 App. Div. 862, 875; affd., 192 N. Y. 541.)

The evidence was relevant to the issue. It tended to establish a division of the spoils. (*Tuckerman* v. *United States*, 291 Fed. Rep. 958, 970; *Campanelli* v. *United States*, 13 Fed. Rep. [2d] 750; *United States* v. *Jenks*, 264 Fed. Rep. 697, 700.)

In *Clune* v. *United States* (*supra*) the government was endeavoring to establish a conspiracy by circumstantial evidence. Referring to certain evidence which had been received, the court said: " It is familiar law that where a case rests upon that character of evidence much discretion is left to the trial court, and its ruling will be sus-

tained if the testimony which is admitted tends even remotely to establish the ultimate fact."

The evidence presented a question of fact as to whether the defendant Seely was a co-conspirator. As assistant engineer in the engineering department, he was in charge of preparing the specifications for sewers. Prior to the time when Phillips became interested in selling precast lock-joint sewer pipe, the specifications in the borough of Queens had called for monolithic constructed sewers. A short time before Phillips took over the agency for precast lock-joint pipe, the specifications had been changed so as to permit contractors to bid on both kinds of construction. Thereafter Patrick McGovern, Inc., bid for a contract for a sewer. Its bid was low and it was awarded the contract. It used the monolithic form of construction, and Phillips did not have the advantage of selling his pipe. Thereafter Seely changed the specifications for the construction of monolithic sewers by providing that sewers so constructed should have a waterproofing, both in the main part of the sewer and in the manholes, chambers and foundations thereof. The effect of such change was to require twenty-one days to do the work which had formerly been done in three and a half days. It had the effect of making the construction of monolithic sewers so expensive and difficult that during the period in question no other monolithic sewers were constructed in the borough. The witness Paulsen testified that after the change in the specifications had been made he met Seely in Phillips' office and that Seely explained the change in the specifications to him and said: " I have got this dolled up so that Pat McGovern wont come in and muss up any of this work again. If you can show me where you can build forty feet (of sewer) in shorter than twenty-one days you are a good one." Phillips said Seely was: " The fellow that can doll them up for you; " and told Paulsen that he wanted him to

take care of Seely and give him $1,000. Paulsen testified that he and Seely then went to a drug store and Seely said: " If you want to take care of me as you spoke of upstairs, you can leave it here." Seely did not testify and the testimony of Paulsen was not directly disputed. Although Paulsen testified that he did not pay Seely any money, it is urged that he was an accomplice and that his testimony was not corroborated. An examination of the record discloses sufficient evidence of corroboration of Paulsen's testimony. The most convincing is the conduct of Seely thereafter. When it was discovered that the change in the specifications required the manholes, chambers and foundations to be waterproofed as well when precast lock-joint pipe was used as when monolithic construction was used, Seely again changed the specifications by eliminating the waterproofing in the chambers, manholes and foundations, but retained the provision requiring waterproofing of the main part of the sewers where monolithic construction was used, which alone was in competition with Phillips' precast lock-joint pipe.

We have examined all of the other alleged errors but do not deem it necessary to discuss them, as we are in accord with the disposition made of them by the Appellate Division.

The judgment should be affirmed.

CARDOZO, Ch. J., POUND, CRANE, LEHMAN, KELLOGG and O'BRIEN, JJ., concur.

Judgment affirmed.