In the Matter of HAROLD L. KUNSTLER, an Attorney, Respondent.

First Department, June 30, 1936.

*Kenneth E. Walser* of counsel [*Thomas Shaw Hale* with him on the brief], for the petitioner.

*Harold L. Kunstler*, respondent, in person.

MARTIN, P. J. In October, 1935, the present proceeding for disbarment of Harold L. Kunstler, an attorney, was instituted by the Association of the Bar of the City of New York on a petition setting forth twelve charges of professional misconduct. After answer and the denial of a motion by respondent to dismiss the charges, the matter was referred to an official referee to hear and report. The referee having found adversely to the respondent on several of the charges, the matter is now before the court for such action as it may deem proper.

The respondent is an experienced attorney. He was associated with the office of the corporation counsel of the city of New York and with the office of the district attorney of the county of New York. In February, 1928, he was appointed a justice of the Municipal Court of the City of New York and in November of that year was elected to that office which he continued to occupy until June 15, 1934, when he resigned, as stated by the referee, " to avoid the disgrace of removal from office." The evidence adduced in the removal proceeding indicated that this removal could not be avoided. In fact the very able referee before whom the proceeding was being conducted stated, following the resignation, that he considered that the respondent was wise in resigning for he would have been obliged to recommend his removal.

We will now consider these charges in the order they were considered by the referee, irrespective of their importance.

The first and third charges grow out of what must be looked upon as an abortive attempt to defeat the collection of a judgment obtained by the Superintendent of Insurance of the State of New York, as liquidator of the Equitable Casualty and Surety Company, upon a note executed by the respondent in favor of the surety company. This judgment, in the sum of $8,505.38, the respondent suffered to be entered against him by default on October 21, 1931. On October 23, 1931, a default judgment was entered against the respondent in the sum of $10,962.50 in favor of one Charles Leef. Execution was immediately issued on the Leef judgment and returned unsatisfied on October 26, 1931. An order garnisheeing the respondent's salary as a justice of the Municipal Court was obtained by Leef on October 28, 1931. This had the effect of rendering ineffectual the judgment obtained by the Superintendent of Insurance. After investigation, the collusive aspect of the situation so impressed the office of the Superintendent of Insurance that a suit was contemplated. Negotiations, however, led to the Leef judgment being subordinated to the judgment in favor of the Superintendent of Insurance so that the latter might be paid through garnishment of the respondent's salary.

The attempt to support the Leef judgment as *bona fide* is without merit. The circumstances surrounding the entry of this judgment are more than suspicious. Leef failed to explain the matter or to testify before the referee. Respondent testified that it was a mere coincidence that Leef entered his judgment immediately after the judgment in favor of the Superintendent of Insurance had been entered. The record does not support this suggested coincidence. The Leef action was not commenced until five months after the Superintendent of Insurance had commenced his action. The testimony is that Leef was pressing respondent for payment during the summer of 1931 and proposed garnisheeing respondent's salary, to which the latter claims he expressed no objection. The summons was served on September fifteenth and judgment could have been entered any time after October fifth. It was not entered until after the judgment in favor of the Superintendent of Insurance had been obtained. The relationship between respondent and Leef is probably best explained by the following quotation from the respondent's testimony: " I will say now to you, Judge, that if I told him not to ask me — not to garnishee my salary, he would not have done it. There is no doubt about that."

To support the claim that his obligation to Leef was genuine, respondent testified that Leef had been financing him for a period

of time; that whenever he borrowed from Leef he gave the latter a note and in March, 1930, Leef showed him a number of notes representing money owing by respondent totaling perhaps a few hundred dollars more than $10,000, and at that time respondent gave Leef the note for $10,000, and cash for the balance and all the other notes were destroyed. The testimony is that neither respondent nor Leef kept any records of their financial transactions. At one time respondent asserted that the records of the Corn Exchange Bank covering the Leef account would demonstrate the genuineness of the indebtedness. These records when produced, however, indicated respondent's indebtedness as being only $2,350. Faced with this evidence, respondent took the position that the payment by Leef to his bank did not necessarily mean payment by respondent to Leef. Assuming this to be true, the accountant's testimony on behalf of the respondent shows an indebtedness of not exceeding $7,310, when the note for $10,000 is claimed to have been given. Any force this testimony might have, however, is negatived by the record of a transaction had a few days after the date of the note in question in connection with a loan of $1,100. Subsequent transactions indicate payments to Leef, not satisfactorily explained, totaling $3,070. Such payments would either reduce the indebtedness as shown by the accountant's testimony to $4,240 or leave Leef indebted to respondent in the sum of $720 at the time Leef entered judgment for almost $11,000.

The absence of any record of the transactions between these parties is indeed strange. Respondent's protestation that he owed Leef the amount of the note in question is not supported by any credible evidence. The referee stated in his report:

" I am forced to the conclusion that the indebtedness to Leef as evidenced by the $10,000 note was fictitious and that the Leef judgment was entered by connivance with the respondent to prevent the collection of the judgment of the Superintendent of Insurance. * * *

" I find that the respondent did not owe the amount claimed in the Leef complaint and that the Leef judgment of October 23, 1932, was entered in collusion with the respondent so as to prevent the collection of the judgment of the Superintendent of Insurance."

Our examination of the record indicates that no other conclusion or finding would be justified.

The second, fourth and fifth charges relate to the question of the respondent's solvency during the period 1927 to 1932; statements made by him in connection with loans for his benefit and his answer and testimony in the removal proceeding with reference thereto.

During this period he owed from $20,000 to $30,000 and had no assets. He has stated that he had no income other than his salary. In one application for a loan in 1929 he refrained from answering the following question: " What is the total amount of your debts? " In 1930 he signed a co-maker's statement in connection with the application for a loan from the Personal Finance and Thrift Corporation. He gave the following information:

" Have you been a borrower or co-maker on a loan of this Company? No.

" Other companies or banks? Yes.

" (If answer is yes, give details.) Gotham Loan."

At that time respondent owed Gotham Loan Company $2,500 and was the maker or co-maker on additional loans from other companies totaling $22,870.66. In 1929 he applied to the National City Bank for a loan of $5,000 and in 1930 he applied to the same institution for a loan of $2,000. On each occasion on the application form he filled in the word " none " following the statement: " Applicant will list any loans outstanding at the present time: (If none, please state ' none.') "

In 1929 he was obligated to other institutions for $9,630, and in 1930 for $11,500. His explanation of his statement to the National City Bank is that it was suggested by one of the attorneys for the bank. This was made the basis of charge number five.

Aside from the fact that respondent being familiar with the law must have known that these various statements were a violation of the provisions of section 1293-b of the Penal Law, they manifest a recklessness which borders on dishonesty.

His answer in the removal proceeding denied that he was insolvent, but as to this we agree with the referee that his denial was more improvident than deliberately false.

The testimony with reference to the part played by one of the attorneys for the bank in connection with his applications for loans from the National City Bank pictures an astounding as well as an improbable situation. While it is possible that respondent as a justice of the Municipal Court had occasion to facilitate details for this attorney, it is unlikely that the latter to reciprocate would have gone to the extent claimed, which the referee states would amount to a conspiracy against the bank. The testimony is characteristic of the respondent's indifference to truth.

The questions asked by respondent of the witness Keefe, which were in effect boastful admissions of at least questionable conduct, should be sufficient to discredit him. These questions indicated not only an absolute failure to appreciate the obligations of a judge or lawyer but a total absence of all sense of propriety or ethical standards.

In support of his assertions, the respondent testified in his own behalf, as follows: " While I was on the bench, I became acquainted with * * * the attorney of record for the National City Bank, Personal Loan Department. During the summer he would, while I was on vacation, find me somewhere, and I would go up to the Ninth District, if I remember definitely, and I would sign hundreds of garnishee orders for him, for the National City Bank, because he told me that the judges who were working up there during the summer were a little lazy, and they did not get to him as soon as he wanted them to, and they were delaying the procedure in collecting money, and I used to go up there from time to time to sign these garnishee orders for him."

Referring to a time when he was in need of money, respondent testified: " I asked him * * * if he could get me a loan of $2,000, and again he brought the application to me either at the Court House — at the Court House. As a matter of fact, I never went near the National City Bank except on one occasion, when I went up there to get the $2,000 — when I went up there to get this money. I had never been there before, and I have not been there since. Just on the one occasion did I go to the National City Bank. * * * brought these applications to me in the Court House. And the same thing occurred then. I filled out the application ' To pay off obligations,' and he insisted — the same way,— I again said ' None ' and * * * was standing there alongside of me and said nothing."

To show the callousness of respondent, we quote the testimony of the witness Keefe on cross-examination, when the respondent propounded, among others, the following questions: " Q. Did you appear before me at any time on motions? A. Yes, I appeared before you in connection with motions. Q. Many motions? A. Many motions. Q. Many — many motions? A. Yes, a great many motions. Q. And you consulted with me, if you recall — going ahead a little of what I have in mind, but I ask you: you consulted with me as to the advisability of transferring your business from the Ninth District Court to the Third District Court, where you would get better service, didn't you? A. Why, no; I never consulted you with respect to that, because that would be a matter of policy for the bank to determine. Q. Do you remember that during the Summer of one year that I was not working or assigned anywhere, that you called me to go to the Ninth District Court and sign hundreds of garnishees for you in the Clerk's office? A. I have no recollection of any such conversation with you. Q. Do you know that I did go to the Ninth District Court when I was not assigned there, and when I was on

vacation, and signed hundreds of garnishee orders for you or your bank? A. I don't recall that you did. Q. Did you tell him that I had been offered $2,000 — pardon me — and that you had won all your cases and all of your motions before me? A. No, I did not. Q. And to make this loan? A. No, I did not. Q. And that I was going to be on the bench, and I would be very helpful to you — not myself, but with the other Judges? Didn't you tell him that in my presence? A. No, I did not. Q. You wanted me to give pretty good service up there? You could use me plenty, couldn't you? A. No, sir. Q. 'So that you could use me plenty,' I mean. A. No, sir. Q. Do you remember some time while this loan was pending, while I had not paid it, that you came to me and asked me to intercede for you in your behalf to talk to some other Judges on the bench, telling me, in your own language, that you heard at that time that they were being pretty rough with you,— * * * and that I told you that I could not very consistently do that, that I was willing to help you in any way possible myself. * * * The Witness: I am positive that I made no such statement."

The above cross-examination gives a better idea of respondent's standards as a lawyer than anything we may say.

The sixth charge is based upon his relations with a certain corporation and testimony given in the removal proceeding concerning the same. The respondent was interested in a corporation known as the Photo Fabrics Products Corporation and it is evident that he used that corporation as a cloak for some of his financial transactions.

In the removal proceeding testimony was given with reference to loans made by various institutions to individuals named Katz, Lazarus and Cohen. Respondent denied that he received any benefit from such loans. It is claimed that such testimony is false, and charges seventh, eighth and ninth are based thereon.

From March 1, 1928, to October 31, 1931, the respondent's salary as a Municipal Court justice amounted to $40,035.44. During this period he deposited in various banks, aside from the proceeds of loans, $166,660.58. There is no explanation with reference to about $84,000 of this sum or where it was obtained by respondent. In the removal proceeding he testified that he had no source of income other than his salary. It is charged that in giving such testimony he testified falsely, and the eleventh charge is partly based thereon.

These charges, sixth, seventh, eighth, ninth and eleventh, have to do with respondent's finances. This subject, while important, is of less pertinence in this proceeding than in the removal proceeding, and covers a period when respondent was not engaged in the practice of his profession. It is the character of his testimony

in relation thereto which is here under review. The very great difference between his salary and the total of his deposits, in the absence of at least a plausible explanation, justifies the inference that he had an undisclosed source of income, and this evidence and the general evasive character of respondent's testimony in connection with this group of charges indicates his heedlessness of the oath to testify truthfully.

The rule laid down in the case of *People* v. *Connolly* (253 N. Y. 330), that evidence of large deposits in banks many times greater than the salary earned by a public official required explanation is particularly applicable to this case. It is a very salutary rule that where public officials have large bank accounts and are unable to account for or explain how they were obtained they may be treated at least with suspicion. No one, of course, will question the right of a public official to a large bank account honestly obtained and for which he is able to account.

The Court of Appeals, in *People* v. *Connolly* (*supra*), at page 340, said:

" The receipt of the evidence of Connolly's financial transactions during the period was justified by elementary principles governing the admissibility of evidence under such circumstances. Phillips and Connolly were engaged in an unlawful scheme to create a fund by fraudulently inducing the city to let contracts at a dishonest and exorbitant price. The unlawful acquisition of money was the very purpose of the conspiracy. The fruits of the dishonesty were traced into the possession of Phillips, one of the co-conspirators. Connolly's unlawful acts helped create the fund. What was his motive? Why did he depart from the path of rectitude and become a party to such a corrupt scheme? The answer is found in the evidence of his possession of that large sum of money, which he tried to cover up so that his possession of it could not be traced through his bank accounts. The evidence established his motive, evidence of which is always competent in a criminal case. (*Pierson* v. *People*, 79 N. Y. 424, 435.)

" It also tended to establish that the co-conspirators were dividing the spoils. The evidence was admissible for the purpose of establishing that Connolly, during the commission of the conspiracy, was in possession of currency in excess of his usual income. His bank accounts disclosed that his salary was deposited and checked out in the usual way and that the $145,000 did not pass through such accounts.

" It was not necessary to offer further preliminary proof of his financial means, and by evidence exclude the possibility that he came by the money honestly. [Cases cited.]

" Connolly testified in his own behalf but failed to offer any explanation of his possession of such a large amount of currency or of his unusual manner of handling it. That was a circumstance which the jury was entitled to consider in determining his guilt or innocence of the crime charged. He was not obliged to become a witness, but having done so his conduct as a witness must be measured by the same standards as apply to the conduct of other witnesses. [Cases cited.] "

The tenth charge relates to the issuance by respondent of a check for $1,000 on October 10, 1930, at a time when his bank balance amounted to $111.32. The record shows that this check was promptly made good and nothing appears to establish a criminal intent upon the part of the respondent.

The twelfth charge is based on the following situation: On March 23, 1932, the respondent was the owner of a co-operative apartment in the Amalgamated Dwellings of Grand Street and on that day he conveyed the same to his wife. The Manufacturers Trust Company recovered a judgment on the Cohen note, referred to in the ninth charge, and to avoid examination in supplementary proceedings the respondent on July 9, 1932, made an affidavit setting forth his financial status and containing the statement, " I have not assigned or transferred any real or personal property." The making of this affidavit is the basis of the twelfth charge. The record shows that the co-operative apartment was of no value. Candor might have prompted some reference thereto. The referee concluded that respondent had no intention to deceive.

The purely criminal aspect of the giving of false financial statements or of giving false testimony is not here involved. Disciplinary proceedings are not criminal, their purpose is not to punish, they are in reality an inquiry into the conduct of an officer of the court.

" A proceeding for disbarment is simply the exercise of jurisdiction over an officer, an inquiry into his conduct not for the purpose of granting redress to a client or other person for wrong done, but only for the maintenance of the purity and dignity of the court by removing an unfit officer." (Boston Bar Association v. Casey, 211 Mass. 187; 97 N. E. 751.)

We are concerned here solely with the question of respondent's fitness to continue as a member of a profession which, as Lord Mansfield said in Ex Parte Brounsall (2 Cowp. 829), " should stand free from all suspicion." One of the requisites for admission to the bar is that the applicant be a person of good moral character. Membership may not be continued on a lower standard, the same condition must be maintained. Had it appeared at the time of respondent's application for admission to the bar that he had

connived at thwarting the orderly administration of the law, had been heedless of the force of an oath to testify truthfully, indifferent to the truth and reckless to the point of dishonesty in financial statements, could we in justice to the public admit him to the bar? The answer is obvious.

The following quotation from *Matter of Ryan* (143 N. Y. 528) is applicable to the situation before us: " The testimony has been examined in this court without prejudice against the defendant and with a most anxious desire upon our part to take as charitable a view of the evidence as could fairly be reconciled with the proper discharge of our duty in the matter. We are fully impressed with the great gravity of the case and of the painful consequences to defendants * * *. At the same time we cannot forget that it rests with the courts to aid and further the efforts on the part of the profession to maintain the honor and integrity of its own members, and whenever a case is presented which shows that an individual member of that profession has been guilty of dishonest conduct in his professional character, it is the duty of the court, when the case is properly proved, to administer the proper punishment. This is not only justice to the profession itself, but it is a protection to the public which ought to be justified in its belief that any one holding a license to practice in the courts of this State is at least of good moral character and fit to be intrusted with the duty of protecting the interests of others."

Opinions may differ with reference to the relative importance of the charges, but there can be no doubt that their accumulated effect establishes the absolute unfitness of the respondent to be a member of the bar.

The respondent should be disbarred.

McAvoy, O'Malley, Glennon and Cohn, JJ., concur.

Respondent disbarred.