THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v.
FRANK A. ERICKSON, Appellant.

Argued March 8, 1940; decided May 28, 1940.

*Martin W. Littleton, Irving Goldberg* and *Richard H. Brown* for appellant. The People failed to establish that defendant maintained himself, in whole or in part, by gaming. (*People* v. *Forte,* 277 N. Y. 440.) The uncontroverted evidence that defendant had ample means of maintenance, independent of his bookmaking business, completely negatived any presumption that he maintained himself, for the most part, by gaming. (*People ex rel. Forster* v. *Warden,* 39 Misc. Rep. 700.) Neither the taking of bets on horse races as a bookmaker upon the New York race tracks, nor the acceptance of such bets over the telephone in New Jersey subjected defendant to the penalty of being adjudged a disorderly person under subdivision 5 of section 899 of the Code of Criminal Procedure. (*People* v. *Martin,* 77 App.

Div. 396; 175 N. Y. 315; *People* v. *Arnstein*, 211 N. Y. 585; *Harris* v. *White*, 81 N. Y. 532.)

*Charles P. Sullivan, District Attorney (George P. Stier* of counsel), for respondent. The evidence clearly shows defendant was guilty of violating subdivision 5 of section 899 of the Code of Criminal Procedure. (*People* v. *Zayas*, 217 N. Y. 78; *People ex rel. Sievers* v. *McGee*, 166 Misc. Rep. 379; *People* v. *Dimitry*, 163 Misc. Rep. 279; *People ex rel. Van Houten* v. *Sadler*, 97 N. Y. 146; *People* v. *Earing*, 71 Misc. Rep. 615; 146 App. Div. 903; *Watt* v. *Malatesta*, 262 N. Y. 80; *Chapin* v. *Austin*, 165 Misc. Rep. 414; *Beach* v. *Queens County Jockey Club*, 164 Misc. Rep. 363.)

LEHMAN, Ch. J. Upon the complaint of an examiner in the Department of Investigation in the city of New York, the defendant has been found to be a " disorderly person, under the terms of subdivision 5, of section 899, of the Code of Criminal Procedure of the State of New York, in that he has no visible profession or calling, by which to maintain himself, but does so, for the most part, by gaming."

Pursuant to a public policy embodied in the Constitution of the State and founded firmly, I think, both on old traditions and sound public opinion, the Legislature long ago enacted statutes to punish gambling and to curb professional gamblers or gamesters. The courts may punish or curb only in accordance with those statutes. In the Penal Law, article 88, the Legislature has declared many forms of gambling to be misdemeanors and has provided penalties for those guilty of such offenses. Thus, in section 970, the Legislature has said that a person who conducts himself in manner there specified or who does any of the acts there enumerated " is a common gambler, and guilty of a misdemeanor." So, " keeping gaming and betting establishments " (§ 973); " keeping of place for game of policy " (§ 974); " persuading person to visit gambling places " (§ 980); " keeping slot machines " (§ 982); together with other acts and other forms of habitual misconduct specified in the Penal Law, are declared to be

misdemeanors and violations of the statute which may be punished by imprisonment. The conduct or acts specified in the Penal Law may, of course, be punished only when the offense was committed within the State and the prosecution must be conducted with the safeguards and subject to restrictions which surround the trial of other penal offenses. The defendant, however, has not been tried or convicted upon a charge of violation of any section of the Penal Law. The charge against him is that he is a " disorderly person " as defined by section 899, subdivision 5, of the Code of Criminal Procedure. Though conviction upon such a charge does not empower a magistrate to pronounce a sentence of imprisonment if the person charged gives security that " he will be of good behavior for the space of one year " (§§ 901, 902), and though the person charged may be convicted after a summary investigation by a magistrate, yet, it is plain that there can be no conviction without proof of every essential element of the charge.

From ancient times law making bodies have recognized that the presence in the community of disorderly persons may constitute a threat to public order or decency. The definition or specification of " who are disorderly persons," contained in section 899 of the Code of Criminal Procedure, includes nine separate classes. Some persons are included who have committed no offense but who practice callings at which goodly citizens in ages past, and perhaps today, look askance. Thus, under subdivision 6 of the statute: " jugglers, common showmen and mountebanks, who exhibit or perform for profit puppet shows, wire or rope dancers, or other idle shows, acts or feats " are, without more, declared to be disorderly persons. There we have vestigial remains of old vagrancy statutes, directed against idle and irresponsible persons rather than against vicious persons. Some persons are included who habitually commit offenses which might subject them to punishment under the Penal Law. Thus, under subdivision 4, " keepers of bawdy houses or houses for the resort of prostitutes "

are also declared to be disorderly persons. It was in regard to the provisions of that subdivision that this court said that the main purpose of the statute is " to arrest the disorderly practices named, by compelling a disorderly person to give security for his good behavior." (*People ex rel. Van Houton* v. *Sadler*, 97 N. Y. 146, 147.) What was there said applies where the statutes declare that those guilty of the " disorderly practices named " are, without more, " disorderly persons." Under subdivision 5, however, only those persons are " disorderly " who not only " have no visible profession or calling, by which to maintain themselves, but who *do so, for the most part, by gaming.*" A charge under that subdivision is not established by proof that the defendant is engaged in gaming as a business. An essential element of the charge is that the defendant maintains himself by gaming. Very different questions would be here if the charge against the defendant had been that he is a disorderly person under the terms of subdivision 4. The charge against the defendant is made only under subdivision 5 and the only question raised, argued or considered upon the appeal is whether a charge under subdivision 5 has been established by competent evidence.

The People must, of course, prove every essential element of the complaint. We may assume that the People have sufficiently proven by the defendant's admissions that gambling in this State or other States has been, over a long period of years, his main occupation but habitual gambling is not the gist of the charge. He has not admitted that he is profiting by that occupation and even if we might, without much hazard, venture an opinion that he derived pecuniary profit from his occupation we could, nevertheless, by no logical process, infer that he maintains himself for the most part by such putative profits when it appears conclusively that he is enjoying an income of at least $12,000 from his investments. In the absence of proof of such fact, even though we may have little if any doubt that the defendant has been guilty of habitual con-

duct which, in the public interest, should be curbed, we are constrained to find that an essential element in the charge has not been established.

The Legislature alone has power to define penal offenses or misconduct which may be curbed or punished by magistrates and courts of criminal jurisdiction. Not even to arrest habitual misconduct which offends public policy or to curb or punish the lawless, may a court disregard or distort the law as formulated by the Legislature.

The judgments should be reversed and a new trial ordered.

RIPPEY, J. (concurring). Defendant was adjudged a " disorderly person " within the meaning and intent of subdivision 5 of section 899 of the Code of Criminal Procedure which provides that " disorderly persons " are " persons who have no visible profession or calling, by which to maintain themselves, but who do so, for the most part, by gaming " and was required to furnish an undertaking of $10,000 to be of good behavior for one year (Code Crim. Proc. § 901).

Persons presented as " disorderly persons " under that statute are neither felons nor misdemeanants and are not charged with nor tried for the commission of any crime (*People ex rel. Clark* v. *Keeper of State Reformatory*, 38 Misc. Rep. 241; affd., 176 N. Y. 465). The proceeding is anomalous since the defendant is not charged with a specific offense but, rather, with habitual misconduct and the magistrate is authorized to conduct and act upon a summary investigation with no mandate to observe the requirements for trial as in the case of persons charged with the commission of crimes (*Hill* v. *People*, 20 N. Y. 363, 368). The person whose conduct is sought to be controlled cannot be charged with the offense of being a common gambler or a bookmaker. Those are included within the purview of article 88 of the Penal Law. Nor can a penalty be imposed on such a person upon conviction on a charge presented under the subdivision of the section under consideration for making, registering or recording " bets and wagers

upon the result of any trial or contest of speed or power of endurance of horses " taking place upon any New York State race track since section 17 of the racing law (Laws 1934, ch. 233) provides a penalty which is declared to be exclusive of all other penalties for the acts specified therein (*People* v. *Stedeker*, 175 N. Y. 57). Though a person may be tried and convicted as a common gambler or a bookmaker under the penal laws or may, upon a proper showing, be subject to the penalty imposed by the racing law, the plea of double jeopardy upon a charge of being a disorderly person under subdivision 5 of section 899 of the Code of Criminal Procedure will not be available to him (Cf. *People ex rel. Van Houton* v. *Sadler*, 97 N. Y. 146).

Under the particular subdivision of section 899 under consideration, proof that a person is disorderly in the generally accepted meaning of the term as applied under vagrancy statutes to those who offend against the public peace, good order, good morals and public safety is insufficient as a basis for conviction. To bring a person charged with being a " disorderly person " within the terms of subdivision 5 of the statute, it must be shown by the People by legally admissible and adequate evidence not only that he had no visible profession or calling by which to maintain himself but also that he maintained himself for the most part by gaming.

All of the evidence on which the People relied was read into the record, over the objection and exception by defendant, from a transcript of testimony given by defendant before a Commissioner of Investigation of the City of New York. It is unnecessary to consider or pass upon the propriety of admitting that testimony. Assuming for the purposes of this decision that it was properly admitted, the testimony so used consisted of voluntary extrajudicial admissions of defendant as to facts both material and relevant to the charge. That concession does not change the law as to the weight to be given to such admissions nor as to their scope or sufficiency. When admissions are exclusively relied upon in a case of this kind they must

possess probative value beyond reasonable doubt as to every element necessary to be proven to establish the charge. Proof by admission of one element essential to the charge does not necessarily raise any inference by way of admission of another separate and distinct element of the charge. Based upon those tests and giving them all the probative value that legally may be assigned to them, admissions made by defendant fail to sustain the charge.

The defendant admitted that he was and had been for twenty years a bookmaker and commission broker specializing in horse-racing bets, with an office for the past twelve years, up until two months prior to the trial, at 1480 Broadway, New York city; that he took bets on horse races and accepted bets on sporting events including prize fights, football and baseball games; that he had two employees at that location; that his receipts and payments were principally by means of checks; that he kept records including a pay-off sheet; that some of the bets were received by him and some by others; that he was also a bookmaker on the New York race tracks, accepted bets at the New York race tracks and did a wire business as bookmaker outside of the New York city lines, taking bets on the wire in New Jersey, and had bookmaking connections throughout the country; that although he had telephone connections in the New York office, he took no bets at that office, that he took the bets from his New Jersey office; and that he also was the financial backer of a crap game and roulette in Florida and of the Club Boheme in Hollywood, Fla., where roulette and dice were the gambling activities carried on. He admitted that taking bets on horse races constituted the largest percentage of his business. He was asked by the prosecutor and said: " Q. Now, by ' business,' we understand each other, you are referring to placing bets on horses? A. That's right. Q. Is that the great bulk of your business? A. Yes, horses. Q. Would you say that 90 to 95 per cent of your business is betting on horses? A. That's right." Those admissions, in short, completed the People's case.

There was no evidence that he was doing business in New York for two months as a bookmaker prior to the trial. No proof or admissions whatever were presented as to the amount of defendant's business as described in the People's case, the cash he received or paid out therefrom, or that he derived any financial return whatsoever from the foregoing activities. The mere fact that a person conducts a particular business *without more* warrants no inference that he is making or losing money in the venture or that he is maintaining himself from it. If the business which defendant described is " gaming " within the meaning of the statute, there was no evidence that from that business he maintained himself in whole or in part. The magistrate recognized this deficiency in proof but asserted that he felt warranted in construing the facts and circumstances most strongly against the defendant since the defendant, if innocent, might have controverted or explained them. As we have said, being a " disorderly person " is not denominated a crime. Nevertheless, it is in nature quasi-criminal since, under the statute, the offender must either post a bond for good behavior or suffer imprisonment. Defendant was under no obligation to prove any fact essential to sustain the charge nor to controvert or explain the admissions relied upon and, from the testimony adduced, no presumption arose as to the source of his maintenance.

With the record in the shape above described, the People rested their case and the defendant's motion to dismiss the information was denied. Though entitled to rely upon the deficiencies in the proof of the People for dismissal of the charge, defendant presented evidence to the effect that he had opened a brokerage account on February 9, 1937, by a deposit of $50,000 in cash in which, on May 6, 1939, he owned securities of the market value of $421,833.46 with an equity of $197,413.72. Additionally, he produced in court 1,119 shares of stock of the National City Bank, which were registered and issued in his name on January 10, 1934, and also 850 shares of stock in the Chase National Bank and 865 shares of the stock of the Chemical Bank

and Trust Company, registered in his name and issued to him on June 28, 1934. He also showed that he owned $125,000 worth of negotiable bonds. Thus it appeared at the close of the case that the defendant had a profit in the two years and three months before the case was tried of some $150,000 through his stock trading account, and that he owned upwards of $125,000 worth of negotiable bonds and 2,834 shares of stock in three of the leading banks of the city of New York from which he had an income of more than twelve thousand dollars per year. The magistrate suggested that the evidence adduced by the defendant could be given no weight since he reached the "irresistible inference" that the defendant's show of wealth came directly from excessive gambling practices. There was no evidence concerning its source. The source was not material on the charge on which he was being prosecuted. We have pointed out that there was no evidence in the case directly proving or from which any inference could be drawn that defendant had any income from gaming with which to maintain himself. Had there been any such evidence, in the absence of testimony or other proof from which the inference properly could be drawn that from the income so received he maintained himself for the most part, proof of his other income, without more, would have been sufficient to require a dismissal of the charge at the close of the case.

In view of what I have said above, I deem it unnecessary to consider any other questions in this case. In my judgment we should not only reverse the judgment but should dismiss the information and discharge the defendant. Three other members of the court are for reversal but believe that a new trial should be granted. Thus, I find it necessary to adopt their view as to the allowance of a new trial.

The order of the Court of Special Sessions, Appellate Term, and the judgment of the Magistrates' Court should be reversed and a new trial ordered.

Lewis, J. (dissenting). I do not share the view of a majority of the court in the decision about to be made. Upon an information filed in the City Magistrates' Court of the City of New York the defendant has been tried and found guilty of the statutory offense of being a disorderly person — one of a class of " Persons who have no visible profession or calling, by which to maintain themselves, but who do so, for the most part, by gaming." (Code Crim. Proc. § 899, subd. 5.)

The statute thus defining the offense is rooted deep in the public policy of this State. Enacted more than a century ago it has long afforded those charged with the administration of criminal law a means by which may be curbed the insidious influence in society of the man who, as a matter of vocational effort, fosters gambling in its varied forms. When we are told, as has been suggested in support of the defendant's position, that recent statutory history in this State indicates that anti-gambling laws have been outmoded, it need only be said in answer that both Constitution and statutes — the two sources to which we look first for declarations of public policy — still stand definitely opposed to the gamester in our social order. (Const. art. 1, § 9; Code Crim. Proc. § 899, subd. 5.) Indeed it is an effort to avoid the enforcement of the statute last cited, in circumstances disclosed by the present record, which brings that statute before us for consideration.

In reviewing the record at hand it should be said that the members of the court differ only upon the question whether, with proper regard for applicable rules of law, it may be said that there is evidence sufficient to sustain the defendant's conviction under the statute invoked against him. Within the terms of the statute our inquiry goes to the question — does the record contain evidence upon which the trier of the facts was legally justified in finding that the defendant has " no visible profession or calling, by which to maintain [himself] but [does] so, for the most part, by gaming? "

Among the first questions addressed to the defendant and answered under oath were the following: " Q. What is your *business or occupation*, Mr. Erickson? A. I am a commission broker. Q. In any particular line? A. Specialize in horse racing bets. Q. How long have you been in that business or occupation? A. I have been in that business twenty years."

When the defendant was asked to " describe in your own words, * * * just what *your* business consists of; what the activities of that *business* include? " he stated: " Well, I take bets on race horses * * * fights, football * * * World series in baseball." Later he was asked: " Q. Do you know what a bookie is? A. I suppose a bookie is the same as I am. That's what I am, a bookmaker. * * * Q. You take your time and give us your description. * * * A. I am a bookie. Now, a man that would book other bets and give bets to me *where I would get a percentage*, I would call him an agent. * * * That's what I would call him. You see, I am a bookmaker, you understand, and if another man took bets and gave them to me, I would call him an agent. Q. Do you pay anybody commission in New York City? A. *I pay some people commission*, but I wouldn't know whether they are in New York or not." After giving the names of four men he was asked: " Q. Are those your biggest agents? A. Yes." When asked whether " other bookies would call up," he stated, " Yes, bookies from, you know, other bookmakers all over the country call up." Although it appears that he accepts bets on various types of " sporting events " the defendant stated that ninety to ninety-five per cent of his business is " betting on horses."

As to the method by which this type of business is conducted by the defendant it appears that for twelve years he had an office on Broadway in New York city with four unlisted telephones. Although the defendant testified at one point that he took no bets in his New York office it appears that he and his cashier took the incoming telephone calls and that it is the cashier who " makes the deposits

in the bank and sends the checks * * * checks to any customers we have business with * * * 98% of the business is done by check." In that connection a significant detail of the business also appears from the following testimony: " Q. Now, when a player wins, *where do you pay off the winnings to the players?* A. *I mail him a check.* Q. And where are the checks mailed from? Where are the checks mailed? A. From where? From that office. Q. And they are deposited in the mail in Manhattan? A. Yes. Q. New York County? A. That's right." In the New York office the defendant also keeps various records including a " pay-off sheet " and a card index on each of which cards is kept " a proper credit notation."

In addition to business of the character described above, conducted by the defendant at his New York office, he maintains a " wire room " in New Jersey with twelve telephones each bearing a number in the New York City exchange. It also appears that he owns a concession at Hollywood, Fla.— " Club Boheme " — where roulette and dice are " carried on."

I thus find proof of a course of conduct by the defendant in which conducting wagers upon sporting events was not an occasional matter in a life spent chiefly in other pursuits. It was a persistent practice continued over a long period of years which the defendant himself admitted was his " business or occupation " and which he conducted in a broad field and by methods which give a clear indication of his studied and successful efforts to promote wagering by others on sporting events for his personal gain. I believe this evidence, when considered with legitimate inferences of fact fairly to be drawn therefrom, afforded the trier of the facts a proper and sufficient basis for the judgment of conviction now before us.

" It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury, beyond a reasonable doubt, of all the facts necessary to constitute the crime charged. In other words, the rule does not require the jury to be

satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt, nor does it require that the evidence should produce absolute certainty in the minds of the jurors.   It is sufficient if the evidence produces a moral certainty to the exclusion of every reasonable doubt.   *   *   *

" To warrant a conviction on circumstantial evidence it is not esential that no inference or presumption shall be indulged in by the jury, that does not, in their minds, necessarily arise from the circumstances proved.   Although circumstantial or presumptive evidence is allowed to prevail, even to the convicting of an offender, still the circumstances must themselves be proved and not presumed. Weight of circumstantial evidence is a question for the jury to determine."   (2 Wharton's Criminal Evidence [11th ed.], § 922, pp. 1609–1611.)   (See, also, *People* v. *Connolly,* 253 N. Y. 330, 339, 341.)

In the face of evidence which tended directly and by legitimate inferences to prove that the defendant has had no visible profession or calling by which he has maintained himself over a period of years and that he did so for the most part by gaming, he chose to offer no evidence except proof that he is possessed of substantial property including bank stocks valued at $120,000 and a brokerage account in which are securities, purchased on margin, and valued at $421,813.46  in which he has an " equity " of $197,413.72. I find nothing in this evidence introduced by the defendant as a defense measure which absolves him from the charge made against him.

It is argued that the law here involved is in character a vagrancy statute and that the proof of defendant's wealth makes impossible the essential finding under the statute that he maintains himself, " for the most part, by gaming." Such an argument, as I view it, disregards the purpose of section 899 of the Code of Criminal Procedure, which this court has held to be " *   *   * to arrest the disorderly practices named, by compelling a disorderly person to give security for his good . behavior."   (*People ex rel. Van*

*Houton* v. *Sadler*, 97 N. Y. 146, 147.) That ruling gave direction for all inquiries thereafter to be made under section 899 including the one in which we are now engaged. The objective then defined remains as clear today. In the exercise by the Legislature of the State's self-protecting power, a means is afforded by section 899, subdivision 5, by which may be stopped the sinister practice by which a professional gamester makes his living. In thus testing the conduct of a defendant charged with any one of the offenses listed in the subdivisions of section 899 this court placed the emphasis on "behavior" as the controlling factor, not upon the fact stressed by the accused that he possesses independent means sufficient for his maintenance.

The conviction should be affirmed.

LOUGHRAN and SEARS, JJ., concur with LEHMAN, Ch. J.; RIPPEY, J., concurs in separate opinion; LEWIS, J., dissents in opinion in which FINCH and CONWAY, JJ., concur.

Judgments reversed, etc. (See 283 N. Y. 774.)