THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CLINTON BRANNON, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LONZO HARDEN, Appellant.

Fourth Department, June 3, 1977

*Martin S. Handelman* for appellants.

*Lawrence T. Kurlander, District Attorney (Edward Spires* of counsel), for respondent.

DILLON, J. The indictment accuses Clinton Brannon, Lonzo Harden and John Albert Simpson of the crimes of attempted sale of a controlled substance in the first degree (Penal Law, §§ 110.00; 220.43); criminal possession of a controlled substance in the third degree (Penal Law, § 220.16); and conspiracy in the first degree (Penal Law, § 105.15).

The first two counts are alleged to have occurred on November 22, 1974 and the conspiracy count charges that the illicit agreement to sell narcotics occurred between November 19 and November 22, 1974. Pursuant to an agreement made before trial, Simpson testified at the trial of Brannon and Harden.

It appears that several months preceding the times alleged in the indictment, Simpson had on two occasions sold narcotics to John Herritage, an undercover police agent. As a result of phone conversations on November 20 and 21, both of which were monitored and recorded, Simpson agreed to sell one ounce of heroin to Herritage for the sum of $1,600. Delivery was to be made on November 22 at Simpson's home on Luther Circle in the City of Rochester. When they met at the appointed time on Luther Circle, Simpson did not have possession of the heroin which, according to his testimony, he was to receive from Brannon and Harden. At that point, at the urging of Herritage, Simpson agreed to procure another half ounce at a new total agreed price of $2,300.

Herritage entered and remained in Simpson's home while Simpson departed in his automobile. A short time later he returned to his home and made two phone calls. At the outset of one, according to Herritage, he said "Is Lonzo there?" Simpson's telephone was monitored by a "trap" device which recorded the dialed phone numbers. The calls were made to numbers listed at the residences of Brannon and Harden, but it does not appear that he reached either of them.

Simpson again left his home to seek out Brannon and Harden, and shortly thereafter Brannon and Harden arrived by automobile at Luther Circle and were observed and identified by Officer Hughes who was on surveillance in the area as part of the police operation. Officer Martin, in another vehicle, also made observations of the movements of Simpson, Bran-

non and Harden at various points leading to and from Luther Circle.

Simpson returned to Luther Circle and Hughes observed Simpson, Brannon and Harden in conversation. Though not seen by Hughes, Simpson was handed a package of heroin. Simpson then told Brannon, in the presence of Harden, that Herritage wanted another half ounce. Brannon agreed and said that they would return. Simpson entered his home, gave the package to Herritage and told him to wait for the other half ounce which he said he would have in a few minutes. No money was exchanged. Simpson then received a phone call which he said was from Harden and was told to meet Brannon and Harden at Cottage and Plymouth Streets, a short distance away. He again left his home. Hughes, who had a receiving set through which he could hear conversations from a device worn by Herritage, was also in radio communication with other police vehicles and when Simpson left Luther Circle, he issued a transmission concerning Simpson's movements.

When Simpson approached the intersection, he came under the observation of Officer Martin. Simpson left his car and walked along Cottage Street. Martin then saw Brannon and Harden moving along Cottage Street in a Cadillac automobile leased by Brannon, and saw what appeared to be a napkin thrown from the car. Simpson picked up the napkin and put it in his pocket. Martin placed Simpson under arrest, and Brannon and Harden were apprehended within minutes thereafter. The napkin, which was recovered from Simpson's pocket, contained a packet of heroin.

On chemical analysis it was determined that the substance given to Herritage at the Luther Circle home of Simpson weighed 27.95 grams of which 6.9% was heroin. The contents of the packet picked up by Simpson on Cottage Street weighed 16.40 grams of which 7.2% was heroin. The chemist testified that there are 28 grams in one ounce and that the combined weight of the two samples was 44.35 grams.

On direct examination Simpson testified that he had an agreement with Brannon and Harden to sell heroin for them and that during the month of November, before he was arrested, he sold various amounts, "four, five bundles, sometimes", each bundle having contained 24 bags or doses of heroin. He sold the heroin for $130 per bundle "but you didn't always get $130.00 for it", and gave the money to Brannon and Harden. He was paid in money and heroin which he used

to satisfy his addiction. He also said that he cut and tested heroin for them because they were not addicts. He would test it "to see if it was too strong or too weak or, if it was good enough to sell". On redirect examination Simpson elaborated upon the nature and scope of his prior drug dealings on behalf of Brannon and Harden.

On this appeal from a judgment entered upon a jury verdict of guilty of all counts in the indictment, Brannon and Harden contend that there was insufficient evidence to establish the existence of a conspiracy; that there was insufficient evidence to corroborate the testimony of the accomplice Simpson; that the court erred in admitting testimony as to prior criminal conduct between Simpson and the defendants, and between Simpson and Herritage; and that it was error for the People to combine two separate and distinct narcotic transactions in an effort to elevate the charge to the level of a class A-I felony.

### THE CONSPIRACY

The defendants' argument relates less to the sufficiency of the evidence taken as a whole than it does to their claim that the People's order of proof was prejudicial. They contend that it was error to receive the testimony of the coconspirator Simpson before the existence of the conspiracy had been "proved", thus binding the defendants to his statements, acts and admissions. The argument is without merit.

The conspiracy was proved not only circumstantially but directly through the testimony of a coconspirator. This, of course, is permissible *(People v Grutz,* 212 NY 72, 79; *People v Flack,* 125 NY 324). Since Simpson was an accomplice, however, it was necessary to corroborate his testimony with evidence tending to connect the defendants with the commission of the conspiracy (CPL 60.22, subd 1). It is not necessary that such legal burden be fully met in a criminal trial as a precondition to the introduction of specific acts of coconspirators *(People v Connolly,* 253 NY 330, 342). Here the testimony of Simpson established the fact of an illicit agreement and thereafter "every act of the individual conspirators done in furtherance of the common purpose [was] admissible" *(People v Connolly, supra,* p 340).

### THE CORROBORATION

The court properly charged that Simpson was an accomplice

as a matter of law. Thus the defendants could not be convicted of any of the offenses charged in the indictment upon his testimony alone, unsupported by corroborative evidence tending to connect the defendants with its commission (CPL 60.22, subd 1). The corroborative evidence is sufficient if it tends to connect the defendants with the commission of the crime "in such a way as may reasonably satisfy the jury that the accomplice is telling the truth" *(People v Wheatman,* 31 NY2d 12, 20, citing *People v Dixon,* 231 NY 111, 116).

Where the principal witness is an accomplice, corroboration is necessary on all counts of the indictment *(People v Malizia,* 4 NY2d 22), but it is equally well-settled that "the corroboration need not establish every element of the offense (see, e.g., *People v Hooghkerk,* 96 NY 149, 162)." *(People v Daniels,* 37 NY2d 624, 632 [WACHTLER, J., concurring].) Whether the testimony of the accomplice has been corroborated to the extent required by CPL 60.22 is a question of fact for the jury.

Applying those broad principles to this case, we find that there was a substantial basis upon which the jury could find that the corroboration standard had been satisfied. The activities of the principals were well established through the testimony of several surveillance police officers, from phone company records and by the testimony of the undercover police agent. While there are some discrepancies in the corroborative testimony, "the independent evidence need not * * * exclude to a moral certainty every hypothesis but that of wrongdoing" *(People v Kohut,* 30 NY2d 183, 193-194). It was for the jury to weigh such discrepancies and determine whether the corroborative evidence still had a tendency to connect the defendants with the commission of the crimes.

## PRIOR CRIMINAL CONDUCT

The conspiratorial agreement was alleged to have been made during a three-day period of November 19 to November 22, 1974. While defense counsel did not immediately object to Simpon's testimony as to prior drug sales on behalf of the defendants, his subsequent objection was closely proximate and was adequate to preserve the issue for appeal (CPL 470.05). His objection was overruled and on redirect examination the District Attorney resumed questioning Simpson on his earlier drug activity in association with the defendants.

The People rely upon *People v Jackson* (39 NY2d 64) and

*People v Latham* (35 AD2d 759) as justification for the admissibility of the prior criminal acts of the defendants. Such reliance is misplaced.

It is the general rule that evidence of prior criminal acts should be excluded because of the danger that a jury might convict a defendant upon his past criminal activity rather than his present guilt *(People v Jackson, supra)*. In *People v Molineux* (168 NY 264) the Court of Appeals articulated several exceptions to this well-established rule. Evidence of uncharged crimes may be admitted at trial if they tend to establish: motive; intent; a common plan or scheme; the absence of mistake or accident; or identity *(People v Molineux, supra,* pp 294-318). Concerning "common plan or scheme", the *Molineux* court observed (p 309): " 'From the nature and prejudicial character of such evidence it is obvious it should not be received, unless the mind plainly perceives that the commission of one tends, by visible connection, to prove the commission of the other by the prisoner.' " (Citing *Shaffner v Commonwealth,* 72 Pa St 60, 65.)

In *People v Grutz* (212 NY 72) the case was prosecuted on the theory that the defendant and one Stein had entered into a conspiracy to induce various parties to insure their household effects in order that Stein would make fires, Grutz would adjust the claims for a percentage thereof and Stein would be paid a fee for starting the fires *(id.,* p 75). Grutz was indicted on three specific fires but the prosecution adduced evidence, from Stein, of nine other incendiary fires in which he said Grutz was implicated with him. The court reaffirmed the prohibition against the admission of other prior criminal acts, citing *People v Shea* (147 NY 78), *People v Dolan* (186 NY 4), *People v Katz* (209 NY 311) and *Molineux (supra).*

In holding that there was no connection between the fire charged in the indictment and any of the other nine different fires in which Stein said the defendant was implicated, the majority in *Grutz* stated:

"[W]e must not overlook the fact that each of the nine other fires was a separate and independent transaction entered into as the occasion arose and not in pursuance of any preconcerted general plan or design. There was between them *no such relation of time, place or circumstance* that the bare evidence as to the origin of any of these fires, in and of itself, tended to prove the origin of the Gold [instant] fire." *(People v Grutz, supra,* p 79; emphasis supplied.)

"It is to be noted also that the evidence as to these other fires is quite unsatisfactory * * *. From the prejudicial nature of such evidence as was given by Stein of other separate fires in which the defendant is said to have been concerned, it is obvious that it should not have been received unless the perpetration of any or all of these acts tended, by *visible connections,* to prove the defendant's complicity in the crime charged in the indictment". *(Id.,* p 80; emphasis supplied.)

In *People v Fiore* (34 NY2d 81) the defendant was charged with bribery involving "kickbacks" from the general contractor of a school construction project. The architect on the project testified that he had previously made unlawful payments to the defendant. Defendant had never been indicted for these payments. This testimony was offered under the theory of the "common plan or scheme" *Molineux* exception. After noting that the rule of exclusion of prior criminal conduct is based upon policy in the criminal law and is not always compelled by logic, the court strictly applied the *Grutz* case to the facts at issue and found the admitted testimony sufficiently prejudicial to reverse. The court distinguished Grutz from *People v Duffy* (212 NY 57), a case decided the same day as *Grutz* (concerning the same issue), based on the fact that in *Duffy* a clear coincidence of persons, time, place and circumstances was established with regard to the prior crimes such as to pass the stringent requirements of admissibility under the *Molineux* exception *(People v Fiore, supra,* p 86).

We turn then to an examination of *People v Jackson* (39 NY2d 64), relied upon by the People. There a police officer testified that he observed two separate occurrences each involving an alleged unidentified buyer of narcotics, who approached the defendant, paid him money, and, after defendant signaled with raised fingers to his alleged confederate, Ms. Watson, seated 8 to 12 feet away, received from Ms. Watson a number of glassine envelopes corresponding to the number of fingers raised. The police backup team failed to seize either of these two buyers, but apprehended a third, who was involved in the transaction which was charged in the indictment.

It is clear that the transactions testified to by the police officer occurred within a matter of minutes each of the other, and both less than an hour before the transaction which was the subject of the indictment. All occurred with precisely the same method of operation at the same location, and were

observed under a continuing surveillance. There was sufficient specificity of time, place and circumstance by "visible connections" tending to prove the defendants' complicity in the crime charged in the indictment *(People v Grutz,* 212 NY 72, 80, *supra).* Such testimony was highly probative and its value outweighed any possible prejudice *(People v Jackson, supra,* p 68).

Nor can the People successfully rely upon *People v Latham* (35 AD2d 759). "The two crimes about which testimony was given by the People's witness in the *Latham* case were so related, each with the other, as to practically make them part of one transaction. The case certainly cannot be cited as authority for permitting the People to prove unrelated, similar uncharged crimes to show that a defendant is guilty of the one for which he is being tried." *(People v Rosado,* 39 AD2d 871, 872.)

Here there was no attempt to establish with any specificity the time, place and circumstance of the prior criminal acts which by "visible connections" would tend to prove the defendants' complicity in the crimes charged in the indictment. While there is a detailed development of the *modus operandi* of the defendants in their dealings with Simpson, the testimony as to prior uncharged transactions is extremely vague and prejudicial. It created a picture of extensive dealing in narcotics by the defendants without specific reference to any particular narcotics transaction. Moreover, it was evidence of prior criminal activity without the kind of specificity which would permit refutation. It impermissibly showed a pattern of conduct without relation to a common plan or scheme. As the court in *Fiore* noted: "In short, merely showing two or more similar crimes does not necessarily establish a common scheme. To some extent every criminal repeater has a *modus operandi.* But a *modus operandi* alone is not a common scheme; it is only a repetitive pattern." (34 NY2d 81, 87.)

Nor is the danger of prejudice overcome by virtue of the inclusion of a conspiracy count in the indictment. Indeed, in *Grutz,* the prosecution theory involved proving a conspiratorial agreement. As the *Fiore* court also noted (34 NY2d 81, 86, *supra):* "in the *Grutz* case, the several fires were separate, independent transactions, separately planned and effected, albeit due to an initial overall agreement between the two culprits."

While it is true that here the "agreement" constitutes an

element of a crime charged in the third count of the indictment, whereas in *Grutz* it did not, the agreement was provable, and indeed was proved, without any need to elicit testimony of prior sales of narcotics by Simpson on behalf of the defendants.

## THE SINGLE CONTINUING TRANSACTION

The crime of criminal sale of a controlled substance in the first degree is a class A-I felony, as is an attempt to commit that crime, and requires proof of the sale of a preparation, compound, mixture or substance of an aggregate weight of one or more ounces containing a narcotic drug. The words "aggregate weight" mean that pure narcotics may be combined with other uncontrolled substances to reach an "aggregate weight" *(People v Thomson,* 49 AD2d 999).

The issue here turns upon the question of whether there was a reasonable view of the evidence from which the jury could conclude that the events at Simpson's home at Luther Circle and the events later occurring on Cottage Street amounted to a continuing single transaction. In light of the testimony of Simpson to the effect that before he delivered the first order of "one ounce" to Herritage, he was told by Herritage that he wanted another "half ounce", coupled with the testimony of Herritage that before the first transaction was completed he told Simpson that he wanted another half ounce and they agreed upon a total price for the entire ounce and one half of $2,300, there was formed an adequate basis for the court's charge that the jury could find that the whole transaction was one, and since the aggregate weight thus exceeded one ounce, the jury could bring in a verdict of guilty of attempted sale of a controlled substance in the first degree (Penal Law, § 220.43).

Since a new trial is required, it is necessary to comment on another aspect of the court's charge. The court erroneously instructed the jury that either set of events (Luther Circle or Cottage Street), if not found to be part of a continuing single transaction, could be a basis for a finding of guilty of attempted sale of a controlled substance in the second degree (Penal Law, § 220.41). Thus, depending upon the jury's finding, the court submitted two separate, distinct criminal transactions as independent crimes descending from a single count in the indictment.

Under such an instruction, a verdict of guilty of the lesser

crime would leave the defendants unaware as to which set of underlying facts or, indeed, which crime formed the basis of the verdict, and would also render impossible intelligent review by an appellate court.

The prosecution proceeded on the theory that there was only one attempted sale of a controlled substance. That choice obviously was made in an effort to sustain a class A-I felony rather than two independent class A-II felonies. The greater crime was alleged in the first count of the indictment and is the only count alleging an attempted sale of a controlled substance. A count in an indictment may charge only one offense (CPL 200.30, subd [1]) and may not be the basis for multiple offenses.

CPL 300.50 requires that lesser included offenses be submitted in the alternative and the language of subdivisions 1 and 4 of that section should not be misinterpreted to permit the kind of submission made here. Where the commission of a greater crime necessarily includes the commission of lesser crimes, each of the lesser crimes may be submitted, in the alternative, to the jury (People v Johnson, 39 NY2d 364). Where crimes are independently committed and are separate and distinct from one another, they must be charged in separate counts of the indictment. While it may be that on retrial the facts will justify the submission of a lesser included count, it may not be done in the style pursued here.

The judgments of conviction should be reversed and a new trial granted.

MARSH, P. J., MOULE, SIMONS and WITMER, JJ., concur.

Judgments unanimously reversed, on the law and facts, and a new trial granted.