■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v

FRANKLIN BEAUCHAMP, Appellant.—Judgment, Supreme Court, Bronx County (Lawrence Tonetti, J.), rendered July 10, 1986 which convicted defendant after jury trial of two counts of sodomy in the first degree of Francisco Bruno (counts 1 and 2); three counts of sodomy in the first degree (counts 3, 4, and 5) and one count of sexual abuse in the first degree (count 6) of Christopher Rivera; and rape in the first degree (count 15) and two counts of sodomy in the first degree (counts 16 and 17) of Shakira Featherston; and sentenced defendant to 8⅓ to 25 years on counts 1 and 2, concurrent to each other but consecutive to the sentences on the other counts, 8⅓ to 25 years each on counts 3, 4, and 5 and 2⅓ to 7 years on count 6, concurrent with each other but consecutive to the other counts, and 8⅓ to 25 years each on counts 15, 16, and 17, concurrent with each other but consecutive to the other counts modified, on the law and the facts to reverse the convictions, vacate the sentences and dismiss the indictment as to counts 1, 2, 3, 4, 5 and 6, with leave to the People, should they be so advised, to resubmit those charges to another Grand Jury, and otherwise affirmed.

Defendant, who was a teacher at the PRACA Day Care Center in Bronx County, was tried and convicted on various charges stemming from his sexual molestation of several very young pupils at that center. The facts and precise nature of the charges are summarized in detail in Justice Smith's dissent.

On this appeal, defendant asserts that the indictment on which he was tried was fatally deficient in two respects—(1) that the time frame set forth was not sufficiently specific and thereby failed to comply with the mandate of CPL 200.50 (6), and (2) that it failed to protect him from duplicitous counts in violation of CPL 200.30 (1).

As to the time frame specified in the indictment, we cannot agree with Justice Smith's conclusion that it was unreasonable on its face and we find, to the contrary, that within the parameters of this case the time frame was set forth with sufficient specificity to meet the statutory requirement.

While CPL 200.50 (6) states that an indictment must contain "[a] statement in each count that the offense charged therein was committed on, or on or about, a designated date, or during a designated period of time", the Court of Appeals in *People v Keindl* (68 NY2d 410) has more definitively delineated the scope and meaning of that section. In its decision in *Keindl (supra,* at 417), the court made clear that the statute

"neither requires the exact date and time, nor does it restrict the length of the designated period of time which may be stated". What is required is that the interval of time set forth in each count reasonably serve the function of protecting defendant's constitutional right to be informed of the nature and cause of the accusation so as to enable him to prepare a defense. *(Supra,* 68 NY2d, at 417.)

In *People v Keindl (supra,* at 418), the court was dealing with repeated criminal sexual acts committed at home by defendant upon his stepchildren who were 8, 9 and 11 years old when the abuse began and the indictment charged defendant "with criminal sexual acts occurring over periods of time extending for as many as 10, 12 and 16 months". While the court found those periods to be unreasonable, it expressly noted that the children in that case "although of tender years, appear to have been old enough to parse the various acts within the time spans with more particularity" *(supra,* at 421).

Most significantly, the Court of Appeals in *Keindl (supra)* emphasized that when time is not a substantive or essential element of the crime charged—as in rape or sodomy—a determination as to whether the time specified is sufficiently specific must be made on an ad hoc basis by considering all relevant circumstances. These include, in addition to the time span set forth and the knowledge that the People have or should have of the exact dates of the crime, the age and intelligence of the victim and other witnesses, the surrounding circumstances and the nature of the offense, including whether it is likely to occur at a specific time or is likely to be discovered immediately. *(Supra,* at 419.)

Relating those precepts to the instant situation it is apparent that we are dealing here with child victims between three and six years of age, years so tender that the children must be said to have had an undeveloped cognitive awareness of precise dates and times and were incapable of specifying the dates of the commission of the particular crimes beyond what was here provided. The very nature of these crimes, which occurred at random and without a precise chronological pattern, the fact that these crimes were committed secretly and in isolation upon each individual child victim by an adult "authority figure", and the psychological implications stemming therefrom, all militated against immediate discovery by either the families of these children or the prosecuting authorities. It is in this setting that we must determine the reasonableness of the specification of the time frame of nine months "excluding weekends". It is also important that such time

frame was further limited to the hours of the school day schedule of the class attended by these children, which corresponded to the times of defendant's employment at the Day Care Center. Thus, not only was defendant clearly on notice that the crimes were alleged to have taken place only during the hours that he was at work, but this was further narrowed by amplification in the bill of particulars as to the precise location of the crimes—i.e., 450 Castle Hill Avenue, in the classroom designated number 205 and in the bathroom of that classroom.

In evaluating the totality of the circumstances present in the instant case, including the realities of the disparate cognitive and recall abilities of an alleged adult perpetrator and infant victims of three to six years of age, we conclude that the information provided to defendant was sufficiently circumscribed as to time and locale so as to reasonably apprise defendant of the specific charges against him within the mandate of CPL 200.50 (6) and that he was enabled thereby to prepare a defense. To accord a contrary construction to the statute under these facts would be to cloak adult perpetrators of heinous sexual crimes with a mantle of immunity when they select as their victims infants whose undeveloped mental capacities make it impossible for them to recall with exact precision the timing of those crimes. We do not believe that the statutory provision was intended to be construed in a manner which totally ignores recognized realities and unnecessarily tramples upon the interests of those least able to protect themselves.

With respect to the convictions involving the victims Francisco Bruno and Christopher Rivera, we are constrained by virtue of the decision in *People v Keindl (supra)* to agree that a reversal is mandated on the ground of duplicitousness in light of the trial testimony as to repeated acts which could not be individually related to specific counts in the indictment. However, as indicated in the factual recitation contained in Justice Smith's dissent, the same is not the case with respect to the three charges involving the victim Shakira Featherston. The indictment charged defendant with three discrete separate crimes committed upon that victim—i.e., rape in the first degree (count 15); sodomy in the first degree (count 16); and sodomy in the first degree (count 17)—and her testimony established that defendant committed each of the described acts only once, thereby eliminating any potential for double jeopardy or questions as to the reliability of the verdict, the concerns stressed by the court in *People v Keindl (supra)*.

We have also considered the other issues raised in the dissent, that is, defendant's entitlement to an identification hearing, the prosecutor's summation, the evidence given by the child witness Tiffanie Kendall and the assertion that the child complainants should have been sworn, and find not only that they are in the main unpreserved, but, also, that they are without merit.

With respect to the identification issue, defendant formally moved by motion dated September 24, 1985 to suppress the children's identification testimony on the basis that the identification process was tainted and suggestive because photographs of the defendant had been shown to the children. Since we agree that all the convictions except those involving Shakira Featherston must be reversed, our discussion on the identification issue is limited to that complaining witness. The trial court's denial of the motion insofar as it related to Shakira was wholly proper since, concededly, she was a student in defendant's class in room 205 and saw him daily on a weekday basis. Since defendant was well known to her, there was no identification issue and no need for a *Wade* hearing. *(See, e.g., People v Tas,* 51 NY2d 915; *People v Gissendanner,* 48 NY2d 543.) In addition, the photographs at issue, which were taken after the defendant's arrest, were used to confirm her identity of the defendant rather than for the purpose of identifying a perpetrator, so no *Wade* issue was implicated. Nor is the dissent's reference to the amendment of the statute governing suppression motions availing. The amendment to CPL 710.60 (3) does not enlarge the legal basis, in distinction to the factual basis, for the granting of a *Wade* hearing, especially where, as here, the defendant and the witness Shakira Featherston were previously known to one another. *(See,* Preiser, Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, 1988 Pocket Part, CPL 710.60.)

No objection having been raised with respect to any of the comments in the prosecutor's summation which are now complained of, that issue is unpreserved. Moreover, those comments were in the nature of an explanation in response to the vigorous defense assault upon the children's initial hesitancy to tell the whole story.

The Judge's charge regarding the unstricken testimony of Tiffanie Kendall was likewise not objected to. Despite repeated opportunities to raise objections to the charge, including a robing room conference for that purpose, no objection whatsoever was directed to this portion of the charge by defense

counsel although specific objections were made by him to other parts of the charge.

As to the dissent's observation that these child witnesses should not have been sworn, reference to the record demonstrates that the Trial Judge carefully and meticulously examined each of the children involved to ascertain whether they understood and appreciated the meaning of the oath and their individualized answers amply support his conclusion that each should be sworn. Concur—Sullivan, J. P., Asch and Ellerin, JJ.

Smith, J., dissents in part in a memorandum as follows: I agree with the majority that the convictions relating to acts allegedly committed against Francisco Bruno and Christopher Rivera must be reversed. I dissent from the conclusion of the majority that the conviction relating to acts committed against Shakira Featherston should be upheld. I dissent, in part, because (1) contrary to the view of the majority, all of the convictions are subject to reversal on the ground of duplicitousness; (2) the notice of the charges given to the defendant was inadequate and misleading in view of the People's contention and the evidence; (3) a hearing on the defendant's motion to suppress any identification by the child complainants should have been granted; (4) the District Attorney went outside of the evidence in the summation to the jury to strengthen a case which had not been proved beyond a reasonable doubt; and (5) the court improperly permitted the jury to consider evidence about charges which it had dismissed. In addition, the child witnesses should not have been sworn since they did not show that they understood the nature of an oath. These defects, in my view, are sufficient to challenge any conclusion that defendant's guilt has been proved beyond a reasonable doubt.

By a judgment entered on July 10, 1986, defendant stands convicted of two counts (counts 1 and 2) of sodomy in the first degree of Francisco Bruno, three counts (counts 3, 4 and 5) of sodomy in the first degree and one count (count 6) of sexual abuse in the first degree of Christopher Rivera and one count (count 15) of rape and two counts (counts 16 and 17) of sodomy in the first degree of Shakira Featherston.

The charges contained in the indictment grow out of incidents which allegedly occurred at the PRACA Day Care Center in Bronx County, New York City. The original indictment contained 18 counts. After jury selection, the trial court granted the People's motion to dismiss the eight counts charg-

ing acts committed against Manday Lopez (counts 7 to 14: two counts of rape in the first degree, two counts of sodomy in the first degree and four counts of sexual abuse in the first degree). After the People's case, the trial court granted defendant's motion to dismiss the only count relating to Tiffanie Kendall (count 18) charging rape in the first degree.

The original charges and the testimony, all of it under oath, from the May and June 1986 trial relating to acts allegedly committed against Francisco Bruno, Christopher Rivera, Shakira Featherston and Tiffanie Kendall are as follows:

1. Francisco Bruno—counts 1 and 2:

Defendant was charged with sodomy in the first degree by engaging in deviate sexual intercourse with Bruno by forcible compulsion, i.e., contact between the penis of the defendant and the mouth of Bruno (count 1) and contact between the penis of defendant and the anus of Bruno (count 2).

The acts are alleged to have occurred between October 31, 1983 and August 1, 1984.

Francisco Bruno was born on June 6, 1978 and was five and six years old at the time of the alleged acts. He was seven years of age and in the first grade when he testified in May 1986. Bruno testified that defendant had put his penis in Bruno's "mouth" and "butt". With respect to how many times this had occurred, the following questions and answers were given on direct examination:

"Q. Papo, how many times did Mr. Beauchamp do that to you?

"A. One time. Or four or something. I don't know.

"MR. SUAREZ: I'm sorry, I didn't hear that.

"THE COURT: How many times did he do it?

"THE WITNESS: One time or two or four * * * I don't know.

"THE COURT: One time or two or four?

"THE WITNESS: I don't know. Maybe it was two or something like that."

Medical records and testimony revealed that on August 9, 1984 Bruno's penis and anus were normal. Bruno's mother testified that in January 1984 and in the spring of 1984 he was wetting his bed, wanting to sleep in the bed with her, and objecting to her seeing him take off his clothes. She also testified that she was told by a teacher at PRACA that her son was disruptive. Finally, she testified that she has a $10 million lawsuit against the City of New York for the events at PRACA.

## 2. Christopher Rivera—counts 3, 4, 5 and 6:

Defendant was charged with three counts of sodomy in the first degree (counts 3, 4 and 5) and one count of sexual abuse in the first degree (count 6). Specifically, it was alleged that the defendant engaged in deviate sexual intercourse with Christopher Rivera by forcible compulsion by contact between the penis of the defendant and the mouth of Rivera (count 3), contact between the penis of defendant and the anus of Rivera (count 4), and contact between the mouth of the defendant and the penis of Rivera (count 5). Defendant is also alleged to have subjected Rivera to sexual contact by touching Rivera's penis (count 6).

All of the acts are alleged to have occurred between October 31, 1983 and August 1, 1984.

Rivera was seven years old and in the first grade at the time of his testimony. He testified that he was seven years of age on April 7, 1986 and he was thus four and five years of age at the time of the alleged acts. Rivera testified that the defendant touched his (Rivera's) penis and butt and put his penis in the mouth and butt of Rivera. He testified further that defendant put his mouth on Rivera's penis. Rivera testified that this occurred "about two times."

There was medical testimony that when Rivera was examined on August 3, 1984, there was a skin tag or extra piece of skin at the anal opening. The doctor testified that the skin tag was consistent with increased friction in the area and with penetration by a male penis. She further testified that the skin tag was consistent with constipation but this was rare. Finally, she stated that skin tags in the rectum without sexual abuse are rare.

Rivera's mother testified that in July and August 1984 her son exhibited unusual behavior, including locking himself in the bathroom, yelling at her to leave the bathroom, not wanting to be left alone and not wanting to go to school. She has a lawsuit against the city for the alleged incidents at PRACA.

## 3. Shakira Featherston—counts 15, 16 and 17:

Defendant was charged with rape in the first degree (count 15) and sodomy in the first degree (counts 16 and 17). Specifically, defendant was accused of sexual intercourse with Featherston by forcible compulsion (count 15), deviate sexual intercourse by contact between the penis of the defendant and the mouth of Featherston by forcible compulsion (count 16) and

contact between the penis of the defendant and the anus of Featherston by forcible compulsion (count 17).

All of the incidents are alleged to have occurred between October 31, 1983 and August 1, 1984.

Shakira Featherston was six years old and in the first grade when she testified on May 22, 1986. She testified that her birthday was May 24. She was thus four or five years of age at the time of the alleged acts. She testified that defendant put his penis in her mouth, vagina and butt. He did this "once."

The medical records and testimony showed that when Featherston was examined on August 7, 1984, she permitted examination of her vagina without a fuss, an unusual occurrence in a child of her age. There was also a "slight irregularity" in the vaginal area. The medical expert testified that she did not know what the words "slight irregularity" meant, although they might have meant that there were a couple of bumps on the hymeneal ring. She gave no cause for this.

Featherston's mother testified that she had not noticed any change in her child's behavior and the child never told her of any incident with the defendant. She also testified that she told the District Attorney that she felt nothing had happened to her daughter. In addition, the mother testified that an Assistant District Attorney told her that something "might" have happened to her daughter. Finally, the mother testified that her daughter spoke to Ann Bush, an investigator with the office of the District Attorney, and her daughter "told Ann what had happened to her." What the daughter told Ann Bush was not revealed at the pretrial proceedings or the trial.

4. Tiffanie Kendall—count 18:

Defendant is alleged to have engaged in sexual intercourse with Kendall by forcible compulsion.

The rape is alleged to have occurred between October 31, 1983 and August 1, 1984.

Tiffanie Kendall was six years old at the time of her testimony. Her birthday was April 23. She was three or four years old at the time of the alleged act. She testified that defendant "put his pee pee in my pee pee." She did not identify the defendant and, at the end of the People's case, the trial court granted defendant's motion to dismiss the charge with respect to Kendall.

The indictment contained eight counts (7 to 14) involving Manday Lopez which were dismissed at the request of the People after jury selection. They were as follows:

Defendant was charged with rape in the first degree (counts

7 and 8), sodomy in the first degree (counts 9 and 10), and sexual abuse in the first degree (counts 11, 12, 13 and 14). Specifically, defendant was accused of the following acts:

Rape by sexual intercourse by forcible compulsion (count 7) and by sexual intercourse with a female less than 11 years old (count 8);

Sodomy by deviate sexual intercourse by means of the penis of defendant and the mouth of Lopez (count 9) and the penis of defendant and the mouth of Lopez, a child less than 11 years old (count 10);

Sexual abuse by touching the vagina of Lopez (count 11), by touching the vagina of Lopez, a child less than 11 years old (count 12), by touching the chest of Lopez (count 13) and by touching the chest of Lopez, a child less than 11 years old (count 14).

I turn now to the specific defects and errors in these proceedings. First, the convictions with respect to illegal acts against Bruno, Rivera and Featherston must be reversed because the counts charging sodomy, sexual abuse and rape are duplicitous. CPL 200.30 (1) states, "Each count of an indictment may charge one offense only." The Court of Appeals has underscored this requirement in *People v Keindl* (68 NY2d 410 [1986]). The court stated *(supra,* at 417-418): "It is equally essential to the defendant's ability to make a defense and to plead the judgment in bar of any further prosecution that he not be called upon to answer for more than one offense in each count of an indictment. Indeed the CPL requires not only that each count specify a time when or during which the crime was committed, but also specifically demands that each count of an indictment charge only one offense (CPL 200.30 [1]; 200.50 [3]; *see also, People v Klipfel,* 160 NY 371, 374). Hence, where a crime is made out by the commission of one act, that act must be the only offense alleged in the count. Put differently, acts which separately and individually make out distinct crimes must be charged in separate and distinct counts *(People v MacAfee,* 76 AD2d 157; *People v Brannon,* 58 AD2d 34), and where one count alleges the commission of a particular offense occurring repeatedly during a designated period of time, that count encompasses more than one offense and is duplicitous. (People v MacAfee, supra.)* The prohibition against duplicity furthers not only the functions of notice to a defendant and of assurance against double jeopardy, but also ensures the reliability of the unanimous verdict. If two or more offenses are alleged in one count,

individual jurors might vote to convict a defendant of that count on the basis of different offenses; the defendant would thus stand convicted under that count even though the jury may never have reached a unanimous verdict as to any one of the offenses *(see, People v MacAfee,* 76 AD2d 157, 159-160, *supra)."* (Emphasis supplied.)

It is clear from a reading of the indictment and the People's response to defendant's demand for a bill of particulars that the People proceeded on a theory that the crimes of sodomy, sexual abuse and rape occurred repeatedly over a period of time and that the child complainants were subjected to continuous illegal sexual practices. Specifically, the response of Assistant District Attorney Charles Brofman states the following: "With respect to each and every count of the instant indictment the People are alleging that the criminal acts enumerated occurred in a *continuous course of conduct* on or about and between the date specified." (Emphasis supplied.) In *Keindl (supra),* the Court of Appeals specifically rejected the application of the "continuous crime" theory to sodomy and sexual abuse and, by implication, to rape.

Both Bruno and Rivera testified to more than one act of sodomy and sexual abuse by the defendant. Moreover, their testimony was unclear as to which acts occurred more than once. This lack of clarity is understandable in children of such tender years. But it is impossible to conclude from the evidence that the defendant has been convicted of only one charge in one count.

In *People v Keindl (supra),* the defendant was convicted of sodomy, sexual abuse and endangering the welfare of a child. Several counts of the indictment charged that defendant committed multiple acts of sodomy and sexual abuse against his stepchildren over periods of time extending for as many as 10, 12 and 16 months. Some of the sodomy and sexual abuse counts, although specifying a shorter time period, still alleged multiple acts, frequently of an unspecified number, occurring during the time period. The Court of Appeals dismissed 15 of the sodomy and sexual abuse counts and vacated the judgment of conviction as to those counts, determining that the counts failed to meet the requirements of CPL 200.30 (1) which specifies that each count of the indictment charge only one offense *(see also,* CPL 200.50 [3]). The court rejected the prosecution theory that despite the fact that more than one violation is encompassed in these counts, the convictions should be upheld as "continuous crimes." The court determined that the theory was inapplicable since sodomy and

sexual abuse are crimes which punish the performance of a single act.

Second, the notice of the charges contained in the indictment and the response to the bill of particulars are inadequate.

CPL 200.50 (6) requires the indictment to contain a "statement in each count that the offense charged therein was committed on, or on or about, a designated date, or during a designated period of time". A defendant is thus entitled to know when he is alleged to have committed the acts charged against him. While this requirement does not mean that the exact time must be given, the time span in which the charges alleged to have occurred must be reasonable. In *People v Keindl (supra,* at 417), the Court of Appeals stated: "Although CPL 200.50 (6) commands that an indictment contain a statement in each count indicating that the offense charged therein was committed on, or on or about, a designated date, or during a designated period of time, we have said that the statute neither requires the exact date and time, nor does it restrict the length of the designated period of time which may be stated *(People v Morris,* 61 NY2d 290, *supra).* Nevertheless, the interval of time set forth in each count must reasonably 'serve [ ] the function of protecting defendant's constitutional right "to be informed of the nature and cause of the accusation" ' *(People v Morris, supra,* at p 294; *People v Iannone, supra,* at p 594) so as to enable him to prepare a defense and to plead the judgment in bar of any further prosecution for the same crime. As we emphasized in *Morris,* '[i]n order for a defendant to make his defense "with all reasonable knowledge and ability" and to have "full notice of the charge", it is important that the indictment "charge the time and place and nature and circumstances of the offense with clearness and certainty" ' *(People v Morris,* 61 NY2d 290, 295, *supra,* quoting *United States v Cruikshank,* 92 US 542, 566)." In *Keindl,* the Court of Appeals found unreasonable on their face counts which charged sodomy and sexual abuse over a period of 10, 12 and 16 months.

In my view the allegations that the acts occurred during the period between October 31, 1983 and August 1, 1984, a time span of a little over nine months, are insufficient to give reasonable notice to the defendant of when the various acts were allegedly committed. The period of approximately 10 months during which the People allege that these acts occurred makes it impossible to defend against the charges or to produce witnesses in behalf of the defendant. The argument of

the majority appears to be that where young children are involved and there are allegations of sexual illegality by an adult, the usual standards of notice should be changed. In my estimation to lessen the standard of notice is to lessen the People's burden of proving a case beyond a reasonable doubt. A notice to a defendant which charges the commission of rape or sodomy or sexual abuse on one occasion (in the case of Shakira Featherston) during a period of approximately 300 days is impossible to defend against by providing an alibi or witnesses in the defendant's behalf.

Third, the defendant was entitled to a hearing on his motion to suppress identification testimony by the child complainants. One of the most crucial aspects of this case is the identification procedure used in identifying defendant as the perpetrator of the crimes against the child complainants. Our role as a reviewing court on this issue is hindered by two things. First, the trial court refused to make the Grand Jury minutes a part of the record when requested by the defense attorney to do so. Second, the trial court refused a hearing on the identification procedures used to pick out defendant as one of the perpetrators.

The issue on identification is whether the child complainants voluntarily identified the defendant or were led or induced to identify him through use of photographs or other means. From the sketchy information available in the record, it appears that the defendant was identified in the Grand Jury through the use of photographs. It is unknown whether photographs were used prior to his arrest.

The trial in this case occurred in May and June 1986. It should be noted that effective September 2, 1986, a defendant was relieved of any burden of making a factual showing of a legal basis for suppressing identification testimony before a hearing could be ordered (CPL 710.60 [3]). Thus an allegation that a photographic display tainted an in-court identification would now be a sufficient basis for granting a hearing. Because of the nature of this case and the allegations sought to be proved by the testimony of children of such tender age, a hearing was required.

The contention of the District Attorney, adopted by the majority, that the children all knew the defendant is no answer to the problem of how the children came to identify the defendant as the perpetrator. Only one of the child complainants, Shakira Featherston, was in his class. The issue is whether she and the other children volunteered his identifica-

tion or were led to identify him by photographs or other means.

The issue of identification has been raised by the defendant from the beginning of the case. The indictment is dated September 20, 1984. In a letter, dated October 16, 1984, to Bronx District Attorney Mario Merola, defense attorney Anthony Suarez requested, pursuant to the District Attorney's open discovery policy, "all photographs shown to the People's identifying witnesses and photos shown to children" and any information concerning "the failure of any pre-trial witness to identify the Defendant or Jesus Torres or Albert Algarin and the name and address of such potential witness."

An answer to the letter, dated October 29, 1984, from Assistant District Attorney Charles Brofman to defense attorney Suarez stated that the defense attorney had not agreed to the District Attorney's open discovery policy and thus by his letter of October 16, 1984, the defense attorney had determined "to go formal" with respect to discovery demands. The letter went on to say that the identification demands were not discoverable.

By a notice of motion dated November 7, 1984, the defendant sought omnibus relief pursuant to CPL article 255. In the affirmation accompanying the motion, defendant attacked the identification procedure used before the Grand Jury and sought dismissal of the indictment. Specifically, paragraphs 18 and 19 of the affirmation of defendant's attorney, Anthony Suarez, stated the following:

"18. * * * Furthermore, there is serious question as to the identification procedure used in identifying the Defendant, Franklin Beauchamp, by the complaining witness, children, before the Grand Jury and prior to the Grand Jury.

"19. On information and belief, the children were shown photograph arays [sic] of different teachers and when the child picked out a teacher, he or she then became the target of the investigation."

In a reply to the omnibus motion, dated February 4, 1985, Assistant District Attorney Brofman denied that there was an issue of identification but did not specifically state that no photographs had been shown to the children. Paragraph 10 of his affirmation stated the following: "10. The defense has attempted to introduce an issue into this proceeding, which in fact does not exist: that being identity. There is no question of fact that the defendant Beauchamp was a teacher at the PRACA Day Care Center. The victims of this defendant know

him, and are known to him, therefore eliminating the identity 'issue'."

On April 3, 1985 Justice Lawrence Tonetti denied that part of the omnibus motion which sought dismissal of the indictment but did not specifically refer to the identification issue. In the court proceedings of April 26, 1985 the defense attorney noted that the court's decision did not require the People to indicate how the identification was made and what use was made of photographs or drawings. The court declined to add to its April 3, 1985 decision. The identification issue was raised orally again on August 28, 1985 but the court ruled that no motion was pending before it.

By a motion dated September 24, 1985, the defendant again raised the identification issue. In this motion to suppress identification testimony, defendant alleged that the children had been shown individual photographs prior to making their identifications. Without specifically denying the allegations made by the defendant, Assistant District Attorney Lisa Sarnoff, by an affirmation dated October 25, 1985, contended that the motion "should be denied since the victims and defendant are known to each other".

By oral orders dated December 9, 1985 and January 22, 1986, the trial court denied the motion to suppress identification testimony.

Fourth, the District Attorney impermissibly went outside of the four corners of the evidence in her summation to the jury. *(See, People v Ashwal,* 39 NY2d 105 [1976].) Specifically she told the jury that the child complainants in their testimony were simply repeating what the District Attorney's office already knew. She further stated, contrary to the evidence, that Shakira Featherston had been the victim of rapes and sodomies committed by the defendant and that Shakira Featherston had stated as much to Ann Bush, an investigator for the office of the District Attorney. Specifically, she stated the following:

"By the time they saw you, ladies and gentlemen, some of the children were well used to saying it. It was said in the Grand Jury. They had to say it at other trials, and everything else, but what you hear being read to you, ladies and gentlemen, were not interviews in quiet offices where children first divulged. It's after the children first divulged what happened and so perhaps leading questions were asked to make it easier for the child.

"Nothing is being pulled, I submit, being pulled out of the

air. *These are facts we knew from the children already and now we wanted to ease them through public audience of at least twenty-five people * * *.*

"Shakira told you that she liked PRACA, a terrible thing happened to her at PRACA, and remember when she was asked what happened she looked down, she looked up at the Court, she might have looked over at you, *looked anywhere rather than have to relive the horrors, the rapes and sodomies that this defendant committed upon her two years ago.* Then she finally told you, not in a logical flowing story, but those little bits of pieces that she can remember that were important to her to remember * * *.

"Where does a child think that a four or five child, *[sic]* that a penis goes into someone's mouth, unless they've experienced it, and I submit to you, ladies and gentlemen, that *once she saw it was safe and she told slowly with another interview [sic], Van Busch [Ann Bush] rather than Maria Buonovoglia trying to press it any further, in a quiet office Shakira told the rest of her horror story of being taken into the bathroom and raped and anally and orally sodomized,* and what was her reward for telling this great tale? Having to tell it again to twenty-five people in the Grand Jury.

"She didn't want to answer the questions in the Grand Jury. She didn't even want to tell them what her name was. What she want *[sic]* was her mommy, but the law doesn't allow that, so Shakira had to go into the Grand Jury, an A.D.A., and tell what happened and again, yes, *you might have heard leading questions read to you, but that's not the first interview of Shakira. No one interviewed her in front of twenty-five people. That was going through necessities of the Criminal Justice System and that's what you heard, all of these fears associated."* (Emphasis supplied.)

These statements by the prosecutor vouched for the witnesses and led the jury away from the only thing that should have been considered by the jury, the evidence brought out in court.

The foregoing summation must be viewed in the light of the testimony of Shakira Featherston, testimony which did not prove the defendant's guilt beyond a reasonable doubt. The testimony of Shakira Featherston on direct examination was not comprehensive as to what occurred. When the cross-examination is added, it is evident that the witness was confused.

The testimony of what occurred with respect to Shakira was as follows:

"Q. What happened when you were in the bathroom, Shakira?

"A. He put his penis in my mouth.

"Q. Did he do anything else, Shakira?

"A. Yes.

"Q. What else did he do?

"A. Put his penis in my vagina, my butt.

"Q. Shakira, how may times did Mr. Beauchamp do that?

"A. Once."

These questions were the only questions which dealt with the actual actions of the defendant. No details or description of the event were given. There were, however, other questions on direct examination about the incident, questions which were for the most part leading. They included questions as to whether the defendant took Shakira into the bathroom and whether the defendant hurt her with his actions.

On cross-examination it was brought out that in the Grand Jury Shakira could not remember her name, that she shook her head no when asked if she knew the defendant, that she never saw the penis of the defendant, that the defendant did not put his penis in her vagina, that the defendant never put his penis any where with her and that the incident occurred in the closet and not the bathroom. In addition, during her testimony, she stated that she told her parents about the incident on the day it occurred, although her mother testified that Shakira never told her anything about the incident. At trial she further could not recall if the incident occurred in the summer, winter, spring or fall.

When the District Attorney stated on summation that her office already knew what had happened to Shakira and the testimony was just confirming what was known, the District Attorney, at the least, strengthened the testimony of Shakira in a way which was prejudicial to the defendant.

Fifth, a charge by the court that it could consider the evidence testified to by Tiffanie Kendall was error. Kendall did not identify the defendant. However, she did testify that "Mr. Beauchamp" had raped and sexually abused her. She further testified that a teacher named Albert had raped and sodomized her and that a teacher, Herminia, had "rubbed my pee pee."

The court's charge that the jury could consider the testimony of Kendall was as follows:

"The first charge—let me put it to you this way. One of the

witnesses who testified in the prosecution was Tiffanie Kendall and that testimony was received by the court and has not been stricken and it is evidence for you to consider in the context of this entire case.

"However, the count concerning Tiffanie Kendall, a charge of rape in the first degree, will not be submitted to the jury by this court; and I am doing that as a matter of law. I think clearly you saw as a matter of law Tiffanie Kendall did not make an identification in this case. She was unable to identify anyone in this courtroom as the perpetrator of any crime on her person and accordingly you will not be considering the charge against Tiffanie Kendall.

"However, the testimony that Tiffanie Kendall gave at the trial was admitted by the court. She testified under oath. It was received and you may consider it in evaluating all the evidence in the case."

The effect of the charge was that the jury could consider the testimony of Kendall with respect to the charges of acts committed against Bruno, Rivera and Featherston. Once the witness failed to identify the defendant, her testimony should have been stricken and the jury instructed to disregard it.

While the defense attorney did not object to this instruction from the court, this error and the prosecutor's remarks on facts not in evidence go to the heart of a fair trial and should be considered by this court in the interest of justice.

Finally, in my view the examination of the child witnesses prior to their being sworn did not indicate that they knew, understood or appreciated the nature of an oath. *(See, People v Nisoff,* 36 NY2d 560, 566; *People v Ranum,* 122 AD2d 959 [2d Dept 1986].)* CPL 60.20 (2) precludes the swearing of a witness less than 12 years of age unless the court finds that the witness "understands the nature of an oath." Section 60.20 reads as follows:

"60.20. Rules of evidence; testimonial capacity; evidence given by children.

"1. Any person may be a witness in a criminal proceeding unless the court finds that, by reason of infancy or mental disease or defect, he does not possess sufficient intelligence or capacity to justify the reception of his evidence.

"2. Every witness more than twelve years old may testify only under oath unless the court is satisfied that such witness cannot, as a result of mental disease or defect, understand the nature of an oath. A child less than twelve years old may not testify under oath unless the court is satisfied that he under-

stands the nature of an oath. If the court is not so satisfied, such child or such witness over twelve years old who cannot, as a result of mental disease or defect, understand the nature of an oath, may nevertheless be permitted to give unsworn evidence if the court is satisfied that the witness possesses sufficient intelligence and capacity to justify the reception thereof.

"3. A defendant may not be convicted of an offense solely upon unsworn evidence given pursuant to subdivision two."

Here, the child witnesses were led to their answers and they responded largely in a rote fashion. It suffices to read portions of the examinations to conclude that the children were not speaking with their own comprehension of the meaning of an oath.

The examination of Francisco Bruno, prior to being sworn, included the following:

"Q. Do you got to school, Francisco, yes?

"A. Yes.

"Q. You have to answer. Are you tired?

"A. Yes.

"Q. Why are you tired?

"A. I'm tired of talking.

"Q. You didn't sleep last night?

"A. I slept.

"Q. Francisco, sit up, take your hands away from your face, all right. Listen to me, do you know that you're in court?

"A. hmm?

"Q. Do you know that this is a courtroom?

"A. Yeah.

"Q. Ever been in a courtroom before?

"A. (Witness moved his head up and down.)

"Q. What grade are you in school?

"A. First grade.

"Q. First grade? Do you know how to write your name?

"A. Yes.

"Q. Do you know how to read?

"A. Yes, a little bit.

"Q. Do you know the alphabet?

"A. Yes.

"Q. Let me see you recite the alphabet. A, B, go ahead, can you do that? Let me hear, A, B, C—

"A. I'm tired.

"Q. What?

"A. I'm tired.

"Q. I can't hear you.

"A. I'm tired.

"Q. Do you know how to recite the alphabet?

"A. Yes.

"Q. Do you know how the numbers run, from one to ten, one, two, three, can you count?

"A. Yeah.

"Q. Let me hear you count. You don't want to count for me, no?

"A. (Witness moved his head from side to side.)

"Q. Do you know what it meansd *[sic]* to tell a lie?

"A. What you mean about tell a lie?

"Q. What do you mean by telling a lie?

"A. I don't, I know if I tell a lie I'll get punished.

"Q. Who will punish you if you tell a lie?

"A. My mother.

"Q. Who else will punish you?

"A. God.

"Q. And who else, anybody else?

"A. No.

"Q. Can the Judge punish you?

"A. (Witness moved his head from side to side.)

"Q. Do you know that I am the judge, yes?

"A. Yes.

"Q. Is it good to tell the truth?

"A. (Witness moved his head up and down.)

"Q. Is it important to tell the truth?

"A. Yes.

"Q. Do you always tell the truth?

"A. Sometimes.

"Q. Do you sometimes tell a lie?

"A. Yes.

"Q. Do you know if you tell a lie it is bad to tell a lie? Do you know that it is bad to tell a lie, Francisco?

"A. Yes.

"Q. Do you know what it means to swear to tell the truth, to swear?

"A. 'umm, 'hmm.

"Q. What does it mean to swear to you?

"A. It is like keeping a good promise.

"Q. It is like keeping a good promise?

"A. 'umm, 'hmm.

"Q. Do you go to church?

"A. Yes.

"Q. Where do you go to church, do you know, do you know the kind of church you go to?

"A. No.

"Q. Do you pray in church?

"A. 'umm, 'hmm.

"Q. Do you pray to God?

"A. 'umm, 'hmm.

"Q. Do you know that God wants you to tell the truth?

"A. Yes.

"Q. And if you swear to God to tell the truth will you tell the truth?

"A. Yeah."

The foregoing examination of Bruno demonstrated that because of his youth, he did not possess the capacity or ability to appreciate an oath. It was clear from the over-all questioning that the words he used to describe what it means to swear to tell the truth were not his own.

The examination of Christopher Rivera, prior to being sworn, included the following:

"THE COURT: You can count all the way up to a hundred? Do you go to church at all?

"THE WITNESS: Sometimes on Sunday.

"THE COURT: Sometimes on a Sunday. Do you believe in God?

"THE WITNESS: Yes.

"THE COURT: Do you know what it is to tell a lie?

"THE WITNESS: Yes.

"THE COURT: Is it good to tell a lie?

"THE WITNESS: Bad.

"THE COURT: Bad. Do you ever tell lies?

"THE WITNESS: No.

"THE COURT: You never tell a lie to your mom?

"THE WITNESS: (Indicating in the negative).

"THE COURT: Suppose your mom made special cookies you liked and she told you not to touch them until they were ready to be served, right, and you took one and she asked you 'Did you take one of the cookies?' would you tell her the truth?

"THE WITNESS: I would tell her the truth.

"THE COURT: You would?

"THE WITNESS: Yes.

"THE COURT: You wouldn't lie?

"THE WITNESS: No.

"THE COURT: Suppose she spanked you—suppose she said you weren't supposed to do that and spanked you, would you still tell the truth?

"THE WITNESS: I would still tell the truth.

"THE COURT: Why is that; is it important to tell the truth?

"THE WITNESS: It is important.

"THE COURT: It is important?

"THE WITNESS: Yes.

"THE COURT: Can anything happen to you if you didn't tell the truth?

"THE WITNESS: If I didn't tell the truth I would get punished.

"THE COURT: Who would punish you?

"THE WITNESS: My mom or my dad or God.

"THE COURT: Is God happy when you tell the truth?

"THE WITNESS: Yes.

"THE COURT: And is God angry when you lie?

"THE WITNESS: He is angry.

"THE COURT: Is your mother angry when you lie?

"THE WITNESS: Yes.

"THE COURT: If your mother caught you in a lie would she spank you?

"THE WITNESS: She would.

"THE COURT: Do you know who I am?

"THE WITNESS: Huh?

"THE COURT: Do you know who I am?

"THE WITNESS: Nancy told me.

"THE COURT: Nancy told you. I am the Judge, is that what she told you?

"THE WITNESS: Yes.

"THE COURT: This is a courtroom?

"THE WITNESS: Yes.

"THE COURT: And you know what it means to swear to tell the truth?

"THE WITNESS: Yes.

"THE COURT: If one swears to tell the truth, is that more important than simply saying I am going to tell the truth?

"THE WITNESS: It is more important.

"THE COURT: It is more important?

"THE WITNESS: It is a special promise.

"THE COURT: It is a special promise. Special promise to whom?

"THE WITNESS: God.

"THE COURT: The man is going to say 'do you swear to God to tell the truth', you understand that, that is the oath, that means swearing to tell the truth, that is a sacred oath. And if you violate that oath you could be punished, you understand that?

"THE WITNESS: Yes.

"THE COURT: And if I let you tell your story to the jury, do you swear to tell the truth?

"THE WITNESS: Yes.

"THE COURT: And you won't tell any lies?

"THE WITNESS: I won't tell any lies."

The examination of Rivera did not show an independent ability on the part of the witness to appreciate the nature of an oath.

The examination of Shakira Featherston, prior to being sworn, included the following.

"Q. The jury is going to want to know what happened to you, do you think you can tell them?

"A. I don't know.

"Q. Would you tell them the truth, or would you lie to them?

"A. Tell the truth.

"Q. You would tell the truth? Do you know that it is important to tell the truth?

"A. Yes.

"Q. Do you go to church?

"A. Yes, sometimes.

"Q. Do you believe in God?

"A. Yes.

"Q. If you tell a lie is that bad or is that good?

"A. Bad.

"Q. Could something happen to you if you lie?

"A. Yes.

"Q. What could happen?

"A. They going to punish you.

"Q. Who going to punish you?

"A. The Judge.

"Q. Would God be happy if you told a lie?

"A. No.

"Q. Would God be happy if you told the truth?

"A. Yes.

"Q. Is it important to tell the truth?

"A. Yes.

"Q. If you swear to God to tell the truth is that more important than just if somebody asked you to say something, do you understand?

"A. It is more important.

"Q. It is more important if you swear to tell the truth, do you understand that?

"A. Yes."

While Shakira Featherston did speak of the importance of being truthful, this was brought out, in the main, by leading questions from the Judge. The same leading was evident in the two questions which referred to an oath. While leading can be permissible with young children, the leading here made it impossible to reasonably conclude that Featherston understood the nature of an oath.

The examination of Tiffanie Kendall, prior to being sworn, included the following:

"Q. She's a big girl. Do you go to school?

"A. Yes.

"Q. Where?

"A. Mount Morris Children's Day Center.

"Q. How long have you been going there, do you know?

"A. Fourteen.

"Q. What?

"A. Fourteen.

"Q. Fourteen days or fourteen weeks?

"A. Fourteen weeks—days.

"Q. What do you do there at the school?

"A. Play.

"Q. You play?

"A. Yes.

"Q. Do you go to church?

"A. No.

"Q. Do you know what it means to tell the truth?

"A. Yes.

"Q. What does it mean to tell the truth?

"A. It means, it means if you broke a glass you got to say you did it.

"Q. If you broke a glass you have to admit that you did it?

"A. Yes.

"Q. And if you say that you didn't do it what would you be doing?

"A. Lying.

"MS. BORKO: Tiffanie, can you put the paper down and save it for later to play with? We can put it right over here and you listen to the Judge.

"THE WITNESS: Where is my ring?

"MS. BORKO: In my pocket.

"Q. Tiffanie, do you believe in God?

"A. Yes.

"Q. Is it good to tell the truth?

"A. Yes.

"Q. Is it good to tell a lie?

"A. No.

"Q. If you told a lie here in the court in front of the Judge would that be bad?

"A. Yes.

"Q. Could you be punished?

"A. Yes.

"Q. Who would punish you?

"A. The Judge.

"Q. There's going to be a jury here.

"A. Where is the jury?

"Q. They are here. You have done this before, haven't you, Tiffanie, you testified before in front of a jury?

"A. Yes.

"Q. And do you know that you must tell the truth?

"A. Yes.

"Q. Will you tell the truth?

"A. Yes.

"Q. If I let you testify in front of the jury?

"A. Yes.

"Q. Will your mommy be upset with you if you lie?

"A. Yes.

"Q. Do you know where you are, Tiffanie?

"A. Huh?

"Q. Do you know where you are now?

"A. Yes.

"Q. Where are you?

"A. In court.

"Q. Do you know who I am?

"A. Yes.

"Q. Who am I?

"A. The Judge.

"Q. Do you know where the jury sits?

"A. Yes.

"Q. Where?

"A. Over there.

"Q. And do you know that?

"A. The jury is coming out?

"Q. Not just yet, in a few moments. If you swear to tell the truth do you know that you have to promise God that you are going to tell the truth, do you know that?

"A. Make a special promise to God.

"Q. Special promise to God. Is it important to tell the truth?

"A. Yes.

"Q. Will God be happy with you if you tell the truth?

"A. Yes.

"Q. Or will he be angry if you tell a lie?

"A. Yes.

"Q. Is it a very bad thing to tell a lie in front of the jury?

"A. Yes.

"Q. After you have sworn to God that you will tell the truth and then if you were to lie that would be very bad, would it?

"A. Yes.

"Q. Are you going to tell the truth in this courtroom?

"A. Yes."

Although the charges relating to Kendall were withdrawn from the jury, the leading questions put to her make it impossible to conclude that she understood the nature of an oath.

For all of these reasons, I believe that all of the convictions should be reversed, the charges dismissed and the People given a further opportunity to present the charges in a more specific time frame to a new Grand Jury.